UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE JANE RESTANI, SENIOR JUDGE

_____

|  |  |  |
|---|---|---|
| PT. KENERTEC POWER SYSTEM, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **and** | ) | Court No. 20-03687 |
| | ) | (Consol.) |
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| **Consolidated Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| PT. KENERTEC POWER SYSTEM and | ) | |
| WIND TOWER TRADE COALITION, | ) | |
| | ) | |
| **Defendant-Intervenors.** | ) | |

_____ )

## PT. KENERTEC POWER SYSTEM'S REPLY BRIEF IN SUPPORT OF ITS RULE 56. 2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001

Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Kang Woo Lee
Henry B. Morris
*Counsel to PT. Kenertec Power System*

Phyllis L. Derrick
Rick Johnson
*Consultants to PT. Kenertec Power System*

Dated:  August 6, 2021

## <u>TABLE OF CONTENTS</u>

I.     **Introduction** ...................................................................................................................1

II.    **Commerce's Initiation of the Upstream Subsidy Investigation Was
       Unsupported by Substantial Evidence and Contrary to Law** ......................................2

       A.     **Commerce Had No Reason to Believe or Suspect that Krakatau
              POSCO Received Any Countervailable Subsidy** .................................................4

       B.     **Commerce May Not Use an Export Subsidy or Irrelevant Equity
              Infusions in its 19 C.F.R. § 351.523(a)(1)(iii) Calculation** ................................7

       C.     **Kenertec Did Not Fail to Exhaust its Administrative Remedies on the
              Initiation Issue** ................................................................................................12

III.   **Commerce's Upstream Subsidy Investigation Was Legally and Factually
       Deficient** ................................................................................................................13

       A.     **Commerce's Regulations at 19 C.F.R. § 351.311 Required Commerce
              to Conduct an Investigation, Postpone the Investigation or Invite
              WTTC to Resubmit the Petition** .......................................................................14

       B.     **The Government's Attempts to Distinguish the Contemporaneous
              *Staples from China* Case Must Fail** ..................................................................16

       C.     **Commerce's Facts-Free Upstream Subsidy Investigation Was a *De
              Facto* AFA Determination Made Unlawfully Against a Fully
              Cooperative Respondent** ...................................................................................18

IV.    **WTTC's Arguments Regarding Commerce's Upstream Subsidy Benefit
       Calculation Are Moot** ..............................................................................................21

V.     **Conclusion** ............................................................................................................23

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page(s)**

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)..................................................................................................5

*Christensen v. Harris*,
  529 U.S. 576 (2000)................................................................................................16

*Dorbest Ltd. v. United States*,
  604 F.3d 1363 (Fed. Cir. 2010)..............................................................................13

*E. Sea Seafoods LLC v. United States*,
  34 CIT 438 (2010) ....................................................................................................7

*Gerritsen v. Shirai*,
  979 F.2d 1524 (Fed. Cir. 1992) ..............................................................................20

*Qingdao Taifa Group Co., Ltd. v. United States*,
  637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) .........................................................14

*Saha Thai Steel Pipe Co. v. United States*,
  828 F. Supp. 57 (Ct. Int'l Trade 1993) ..................................................................13

*SKF USA Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001)..............................................................................18

*Sterling Fed. Sys., Inc. v. Goldin*,
  16 F.3d 1177 (Fed. Cir. 1994)...........................................................................5, 20

**Statuatory Provisions**

19 U.S.C. § 1675(a)(1)................................................................................................5

19 U.S.C. § 1675(c)(4)(B) ..........................................................................................7

19 U.S.C. § 1677-1 ...................................................................................................10

19 U.S.C. § 1677-1(a) ...............................................................................................11

19 U.S.C. § 1677e(a) .................................................................................................20

19 U.S.C. § 1677e(b) .................................................................................................20

19 U.S.C. § 1677e(b)(1) ............................................................................................19

19 U.S.C. § 1677m......................................................................................................18

19 C.F.R. § 351.212(c)(1) .................................................................................................5

19 C.F.R. § 351.309(c)(2) ...............................................................................................12

19 C.F.R. § 351.311 .........................................................................................................14

19 C.F.R. § 351.311(b) ....................................................................................................15

19 C.F.R. § 351.311(c)(1) ...............................................................................................15

19 C.F.R. § 351.523(a)(1)(i) and (ii) ................................................................................7

19 C.F.R. § 351.523(a)(1)(i-iii) .......................................................................................11

19 C.F.R. § 351.523(a)(1)(iii) .................................................................................. *passim*

19 C.F.R. § 351.523(b) .....................................................................................................9

## Commerce Determinations

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 ..................................14

*Certain Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, and the
    Republic of Korea: final Results of Expedited Third Sunset Reviews of
    Countervailing Duty Orders*, 82 Fed. Reg. 16,790 (Apr. 6, 2017) ............................6

*Certain Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, Italy,
    Japan, and the Republic of Korea; Final Results of the Expedited Second
    Sunset Reviews of the Antidumping Duty Orders*, 76 Fed. Reg. 12,322 (Mar. 7,
    2011) ...........................................................................................................................6

*Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 Fed. Reg.
    73,155 (Dec. 29, 1999) ..................................................................................... *passim*

*Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia: Final Results
    of Expedited Sunset Review*, 70 Fed. Reg. 45,692 (Aug. 8, 2005) ............................6

*Collated Steel Staples from the People's Republic of China: Final Affirmative
    Countervailing Duty Determination and Final Affirmative Critical
    Circumstances Determination*, 85 Fed. Reg. 33,626 (June 2, 2020) ...................16, 17, 18, 19

## I.    Introduction

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff PT. Kenertec Power System ("Kenertec") submits this Reply to the Response Briefs filed by Defendant United States ("Gov't Resp. Br.") and Defendant-Intervenor Wind Tower Trade Coalition ("WTTC") ("WTTC Resp. Br.").  In its brief in support of its Rule 56.2 motion for judgment on the agency record, Kenertec raised three affirmative issues in this appeal. Specifically, Kenertec disputes:  (1) the decision of the U.S. Department of Commerce ("Commerce") to initiate an upstream subsidy investigation despite the lack of any reasonable basis to believe or suspect that Kenertec benefitted from an upstream subsidy; (2) Commerce's evidence-free upstream subsidy "investigation"; and (3) Commerce's calculation of the "benefit" allegedly conferred upon Kenertec.

The Government requested a voluntary remand for Commerce to address certain aspects of its calculation of Kenertec's *ad valorem* subsidy rate.  *See* Def. Mot. For Partial Voluntary Remand, ECF No. 35 (July 9, 2021) ("Def. Mot. Voluntary Remand").  The Court granted the Government's request.  *See* ECF No. 38 (July 20, 2021).  On August 3, 2021, Commerce issued its draft remand results, removing the Loan Rediscount Program, an export subsidy, from its upstream subsidy calculations, resulting in a *de minimis* countervailing duty rate.  If Commerce sustains its upstream subsidy calculations in the final remand results, it would result in revocation of the countervailing duty order, and largely obviate the need for the Court to consider the additional legal and factual deficiencies in Commerce's *Final Determination*.

As this Reply is due in advance of Commerce's final remand results, Kenertec focuses here on the issues of Commerce's faulty initiation and the fact that its upstream subsidy determination is unsupported by substantial record evidence, as Commerce did not actually gather any evidence related to the upstream subsidy allegation.  For the reasons discussed below,

the Government and WTTC have pointed to nothing that would undermine Kenertec's affirmative arguments on these issues.  Each of the deficiencies Kenertec identified in its opening brief provides the Court with independent bases for ordering Commerce on remand to revoke the countervailing duty order.  Indeed, both the Government and WTTC attempt to frame the case as a typical Commerce exercise of reason and discretion in discharging its obligation to reach a conclusion based on the available information.  But this is not a normal case.  As issue here is a determination devoid of *any relevant facts* pertaining to actual upstream subsidies, with Commerce instead inserting a number pulled from an unrelated 20-year old Federal Register notice as a substitute for the analysis Commerce had already determined to defer.  This approach does not satisfy the substantial evidence standard and is contrary to law in a number of respects.

With respect to the calculation issues, Kenertec addresses these issues in Section IV.  As discussed in that section, Kenertec continues to submit that certain elements of Commerce's calculations remain unlawful; however, Commerce has thus far indicated its intention to reach a *de minims* result in the remand determination, an outcome Kenertec supports.

## II.   Commerce's Initiation of the Upstream Subsidy Investigation Was Unsupported by Substantial Evidence and Contrary to Law

Commerce's decision to initiate an upstream subsidy investigation was unsupported by substantial evidence.  WTTC failed to provide Commerce with any reason to believe or suspect that Kenertec benefited from an upstream subsidy.  The Government and WTTC dispute Kenertec's arguments, and claim that the subsidies found in the 1999 investigation covering *CTL Plate from Indonesia* provided substantial evidence for Commerce's finding that there was a reasonable basis to believe or suspect that Kenertec benefited from a countervailable upstream subsidy.  *See* Gov't Resp. Br. at 43; WTTC Resp. Br. at 12.  WTTC goes a step further to claim

that the Court should decline to consider Kenertec's arguments regarding initiation on exhaustion grounds.  *See* WTTC Resp. Br. at 11.

Each of the Government's and WTTC's arguments is meritless.  Commerce simply is not at liberty to assume that a 20-year-old subsidy finding continues to remain valid when it has conducted no factfinding in that proceeding since 1999.  It was not reasonable for Commerce to assume that the programs found 20 years ago still exist, and that the rates calculated in 1999 are still accurate.  This is especially so because Kenertec' sole Indonesian supplier of CTL plate, Krakatau POSCO, did not begin commercial operations until 2014.  *See* Kenertec's Case Brief at 15, P.R. 246, C.R. 256 (citing Government of Indonesia's September 27, 2019 Initial Questionnaire Response at Exhibit GOI-CTL-13 (containing KP's 2018 Annual Report) at 8-9, P.R. 102, 105-109, C.R. 83, 86-91).

The Government's and WTTC's arguments regarding Commerce's authority to carry rates forward over different segments in the same proceeding are also misplaced.  *See generally,* Gov't Resp. Br. at Sec. III.B; WTTC Resp. Br. at Sec. C.1.  Neither the Government nor WTTC has pointed to any authority to support the proposition that Commerce may graft these legal fictions onto a wholly separate proceeding.

Commerce also erred in its calculations of whether the effect on a respondent's cost of production of any potentially applicable subsidies "on the input product" is equal to or greater than one percent.  *See* 19 C.F.R. § 351.523(a)(1)(iii).  Commerce may not include export subsidies or decades-old equity infusions specific to a supplier from which Kenertec had no purchases during the period of investigation ("POI") in its calculation.

Finally, the Court also should reject WTTC's argument that Kenertec failed to exhaust its administrative remedies because Kenertec, in fact, sufficiently preserved this issue for appeal in its briefing before the agency.

### A.   Commerce Had No Reason to Believe or Suspect that Krakatau POSCO Received Any Countervailable Subsidy

The Government and WTTC argue that Commerce properly initiated an upstream subsidy investigation based on Commerce's 1999 investigation covering *CTL Plate from Indonesia*. *See* Gov't Resp. Br. at 43; WTTC Resp. Br. at 12 (citing *Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 Fed. Reg. 73,155 (Dec. 29, 1999) ("*CTL Plate from Indonesia*")).  For example, the Government claims that "{t}he existence of a countervailing duty order on Indonesian CTL plate with non-*de minimis* rates provided a reasonable basis to believe or suspect that the Indonesian government had provided an upstream subsidy to the two producers of CTL plate in Indonesia, including the producer that supplied Kenertec with CTL plate during the period of investigation."  Gov't Resp. Br. at 44.  WTTC raises similar claims.  *See* WTTC Resp. Br. at 15.  For all of the reasons stated in Kenertec's opening brief, the 1999 *CTL Plate from Indonesia* investigation provides no evidence that a countervailable subsidy on any input purchased by Kenertec during the 2018 period of investigation at issue here.  *See* Kenertec Br. at 19-22.  Moreover, WTTC's vague allegations of "ongoing subsidization" do not bolster Commerce's erroneous initiation finding.  *Id*. at 22-24.

To be clear, Kenertec has not argued that Commerce may not in any instance conduct an upstream subsidy inquiry with reference to prior subsidy findings on the input product.  The Government's and WTTC's attempts to characterize Kenertec's arguments as such are misleading.  *See* Gov't Resp. Br. at 46; WTTC Resp. Br. at 28.  Whatever authority Commerce may have to make reasonable inferences regarding prior CVD proceedings in other cases, it may

not do what it did in this case, which is to premise its initiation decision on stale 20-year-old findings without any showing that those findings remain valid and applicable to Kenertec's CTL plate purchases during the POI.

The Government claims that Kenertec "cites no authority holding that Commerce may not rely on its previous subsidy findings as part of its decision to initiate an upstream subsidy investigation." Gov. Resp. Br. at 48. The fact that the Court has not addressed the precise issue before does not render Commerce's determination reasonable or supported by substantial evidence. Indeed, because Commerce so rarely addresses upstream subsidy allegations or reaches affirmative upstream subsidy determinations it should come as no surprise that there is little relevant precent; this simply underscores how unprecedented Commerce's decision was in this case. It also ignores Commerce's underlying requirement to conduct its proceedings in a manner consistent with the statute. *See Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994). Otherwise, it acts contrary to law and the Court must not uphold the decision. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Commerce's initiation analysis in this case is unreasonable, unsupported by substantial evidence, and inconsistent with the statute.

In response to Kenertec's challenge of Commerce's use of the 1999 *CTL Plate from Indonesia* Final Determination, the Government attempts to hide behind statutory presumptions permissible *within a single proceeding* in order to justify ongoing countervailing duty rates in the absence of an actual review. For example, the Government cites 19 U.S.C. § 1675(a)(1), which provides for administrative reviews of a countervailing duty order if such a review is requested, and a Commerce regulation that assesses duties on entries for which a review has not been requested at the prior rate, 19 C.F.R. § 351.212(c)(1). Finally, the Government cites rulemaking

history that states "the failure of an interested party to file a timely request for review constitutes a determination" for those entries without a review.  Gov. Resp. Br. at 47.

The Government's argument fails to defend Commerce's unreasonable decision to apply this particular rate, many years later, in a completely separate proceeding to a *downstream consumer* without any evidence that these subsidies continue to exist, and if so, whether they existed at the rates calculated 20 years ago.  While the countervailing duty law does create legal fiction whereby the rate determined in the investigation remains the countervailing duty rate in perpetuity, it is not reasonable to suggest that Commerce can simply assume in a separate proceeding that the *status quo* has not changed for twenty years, and applies to a company not in existence at the time of that prior determination.

The same is true regarding the Government's and WTTC's attempts to hide behind Commerce's sunset review determinations in the *CTL Plate from Indonesia* proceeding.  *See id.*; WTTC Resp. Br. at 14.  Commerce has not conducted a full sunset review since the order on *CTL Plate from Indonesia* was imposed in 1999.  *See Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia: Final Results of Expedited Sunset Review*, 70 Fed. Reg. 45,692 (Aug. 8, 2005); *Certain Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, Italy, Japan, and the Republic of Korea; Final Results of the Expedited Second Sunset Reviews of the Antidumping Duty Orders*, 76 Fed. Reg. 12,322 (Mar. 7, 2011); *Certain Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, and the Republic of Korea: final Results of Expedited Third Sunset Reviews of Countervailing Duty Orders*, 82 Fed. Reg. 16,790 (Apr. 6, 2017).

In light of the respondent parties' decisions in those prior sunset reviews not to participate, Commerce relied on the statutory mechanism that enables it to presume, without conducting any analysis, that the levels of subsidization would continue or recur at the rates

found in the investigation if the order were revoked.  *See* 19 U.S.C. § 1675(c)(4)(B).  This is a legal fiction that is permissible in the context of that specific proceeding.  Commerce cannot simply graft that legal fiction onto a separate proceeding covering a different product, with a separate administrative record and a different respondent, without requiring WTTC to provide some modicum of evidence proving that the programs found 20 years ago continue to exist at the rates found.  The sunset reviews are simply re-statements of the rates established in the 1999 investigation and say nothing as to actual subsidies during those later time periods.

Commerce's finding that the 20-year-old subsidy finding remained valid without any further substantiation "pushed legal fiction into the realm of legal fantasy.  Doing so was not in accordance with law."  *E. Sea Seafoods LLC v. United States*, 34 CIT 438, 460 (2010).  Put simply, Commerce cannot be heard to claim the authority to rely on decades-old findings based on a series of legal fictions not applicable to the instant case without even attempting to corroborate them.  The Court should, therefore, order Commerce to find that WTTC failed to demonstrate how the 1999 investigation provided any reasonable basis to believe or suspect that Kenertec benefitted from a countervailable upstream subsidy on its CTL plate purchases during the POI.

**B.**  **Commerce May Not Use an Export Subsidy or Irrelevant Equity Infusions in its 19 C.F.R. § 351.523(a)(1)(iii) Calculation**

Presuming Commerce's reliance on the 20-year-old *CTL Plate from Indonesia* investigation were valid to satisfy 19 C.F.R. § 351.523(a)(1)(i) and (ii), Commerce also erred in the calculation of the effect of alleged upstream subsidies on Kenertec's cost of production required pursuant to 19 C.F.R. § 351.523(a)(1)(iii), which requires that:

> The *ad valorem* countervailable subsidy rate on the input product, multiplied by the proportion of the total production costs of the subject merchandise accounted for by the input product, is equal to, or greater than, one percent.

7

That is, Commerce's regulations provide that the agency may not initiate an upstream subsidy investigation unless it finds that the effect on a respondent's cost of production of any potentially applicable subsidies "on the input product" is equal to or greater than one percent. *See id.* In performing its calculations pursuant to Section 351.523(a)(1)(iii), Commerce relied in its Final Determination in *CTL Plate from Indonesia* on the 15.90 percent "All-Others" rate based on equity infusions specific to Krakatau Steel and on two loan programs: (1) the Rediscount Loan Program (an export subsidy); and (2) the Two-Step Loan Program. *See* Final Det. Calc. Mem. at 2, P.R. 263, C.R. 261 (Jul. 1, 2020). It was improper for Commerce to include the equity infusions and the export subsidy in its calculation because there is no possible way that these programs could have had *any* effect on Kenertec's purchases of "the input product" during the 2018 POI.

The Government in its response brief attempts to claim that it was appropriate to include the equity infusions provided to Krakatau Steel over 20 years ago in its Section 351.523(a)(1)(iii) calculation for a company (*i.e.,* Krakatau POSCO) that did not exist at the time of Commerce's investigation of *CTL Plate from Indonesia*. *See* Gov't Resp. Br. at 49-50. However, the Government's arguments are belied by Commerce's own analysis memorandum in the *Final Determination* in this case. Specifically, without gathering any new evidence in its upstream subsidy "investigation," Commerce stated, in the very next paragraph of the same *Final Determination* analysis memorandum regarding its calculation, that it was "disregarding the countervailable subsidies that were specific to Krakatau Steel in our calculation of what subsidy rate is appropriate for Krakatau POSCO." *Id.*

If it was inappropriate to include these programs in the calculation of Kenertec's subsidy rate because they could not possibly have affected Kenertec's CTL plate purchases during the

POI, it was also clearly improper to include them in the Section 351.523(a)(1)(iii) calculation for purposes of initiation.  The "input product" referred to in Section 351.523(a)(1)(iii) of the regulation is the input sold to Kenertec during the 2018 period of investigation to produce the subject merchandise.  *See* 19 C.F.R. § 351.523(b) ("For purposes of this section, 'input product' means any product used in the production of the subject merchandise.").  If Commerce could tell from the face of the 1999 *Final Determination* that any benefit from these subsidies could not have inured to Kenertec's only supplier of CTL plate during the POI (*i.e.,* Krakatau POSCO), it was improper and contrary to law for Commerce to include them in the Section 301.523(a)(1)(iii) calculation.

Removing these equity infusions (as Commerce properly did in its calculation of Kenertec's subsidy rate) leaves only the Loan Rediscount Program and the Two-Step Loan Program for the Section 351.523(a)(1)(iii) calculation.  Of these two programs, the Loan Rediscount Program is an export subsidy, as Commerce itself found on at least two prior occasions.  *See* Kenertec Br. at 10 (citing *CTL Plate from Indonesia* and *ERT from Indonesia*, 64 Fed. Reg. 14,695 (Mar. 26, 1999) where Commerce determined that the Loan Rediscount Program was an export subsidy).  Commerce also confirmed in its draft remand results that the Loan Rediscount Program constitutes an export subsidy.  As Kenertec explained in its affirmative brief, the "countervailable subsidy rate on the input product" to which Section 523(c)(1)(iii) of the statute refers clearly cannot include export subsidies.  *See id* at 21.  The statute (and Commerce's regulations) exclude export subsidies from the upstream subsidy analysis because, as a matter of logic, export subsidies cannot benefit domestic downstream consumers like Kenertec.  It was, therefore, improper for Commerce to include the Loan Rediscount Program in its Section 351.523(a)(1)(iii) calculation.  Thus, the question here is not simply whether

Commerce can use a 20-year-old subsidy rate as the primary basis to prompt an investigation into a possible upstream subsidy. Rather, the issue is whether Commerce can include subsidies which *cannot be* upstream subsides in its analysis for purposes of Section 351.523(a)(1)(iii) to determine whether to investigation a possible upstream subsidy.

The Government does not address Kenertec's argument on this issue directly in its response brief. WTTC claims, without support, that Commerce has the authority to include an export subsidy in the Section 351.523(a)(1)(iii) calculation. *See* WTTC Br. at 15. Contrary to WTTC's arguments, doing so defeated the clear statutory exclusion of export subsidies in Commerce's upstream subsidy analysis. *See* 19 U.S.C. § 1677-1 ("The term 'upstream subsidy' means any countervailable subsidy, other than an export subsidy{.}").

The Government's silence on this aspect of Commerce's use of the Loan Rediscount Program in its response brief is telling. Commerce knows well that it was inappropriate to use the export subsidy in the Section 351.523(a)(1)(iii) calculation. Indeed, Commerce specifically requested a voluntary remand to reconsider its use of the Loan Rediscount Program in its *ad valorem* subsidy rate calculation for Kenertec, citing Kenertec's argument that including this export subsidy was a "clear legal error." *See* Def. Mot. Voluntary Remand at 5 (citing Kenertec Br. at 39-40). The Government thus appears to recognize that Commerce's analysis of upstream subsidies must preclude reference to export subsidies. More important, it would defy logic (and the plain language of the statute) to permit Commerce to include export subsidies in the Section 351.523(a)(1)(iii) calculation when, as the Government appears to recognize, Commerce may not do so in the *ad valorem* subsidy rate calculation.

Moreover, WTTC's attempt to claim that Commerce satisfied the requirements of Section 351.523(a)(1)(iii) must fail. As discussed above, the plain language of the statute prohibits

Commerce from considering export subsidies in any aspect of its upstream subsidy analysis.  *See* 19 U.S.C. § 1677-1(a) ("The term 'upstream subsidy' means any countervailable subsidy, other than an export subsidy{.}").  An export subsidy, by its very nature, cannot have an effect on "the input product" for subject wind towers produced in Indonesia, and consequently export subsidies cannot serve as a reasonable basis to believe or suspect that Kenertec benefitted from a countervailable upstream subsidy.  WTTC's conclusory argument simply did not provide any valid basis for the Court to ignore the plain language of the statute prohibiting Commerce from using an export subsidy in this calculation.

As Kenertec also explained in its opening brief, removing the 20-year-old equity infusions specific to Krakatau Steel and the Loan Rediscount Program leaves only the Two-Step Loan Program.  This sole remaining program is the only program that could possibly have provided an upstream benefit to Kenertec in the 2018 POI.  Commerce calculated an *ad valorem* subsidy rate of only 0.65 percent for this program.  *See* Kenertec Br. at 21.  Assuming *arguendo* that it was appropriate for Commerce to simply use its stale 20-year-old finding, the effect of this program on the cost of manufacturing or producing the subject merchandise was well below the required showing of an effect "equal to, or greater than one percent" on Kenertec's cost of production of the subject merchandise.  *See id.* at 22; 19 C.F.R. § 351.523(a)(1)(i-iii).

As discussed above, the Court should find Commerce's determination to initiate the upstream subsidy investigation based on the 1999 *CTL Plate from Indonesia* investigation to be *ultra vires*.  However, if the Court were to sustain that aspect of Commerce's initiation decision, the Court should order Commerce to calculate the effect of only the Two-Step Loan Program on Kenertec's cost of production of subject wind towers.  Doing so necessarily would result in a

determination that there was no reasonable basis to believe or suspect that Kenertec benefited

from a countervailable upstream subsidy.

### C.   Kenertec Did Not Fail to Exhaust its Administrative Remedies on the Initiation Issue

Finally, WTTC argues that the issue of initiation is not before this court on exhaustion

grounds.  *See* WTTC Resp. Br. at 9-10.  WTTC's claim is meritless.  Kenertec did not raise the

issue of the upstream subsidy initiation in its affirmative case brief before the agency as a stand-

alone briefing item because Commerce chose to defer further consideration of the issue until any

first administrative review.  Therefore, at the time of the *Preliminary Determination* and briefing

the issue was not "relevant to {Commerce's} final determination" as Commerce had explicitly

deferred any consideration of the upstream subsidy allegation.  19 C.F.R. § 351.309(c)(2).  Any

claim with respect to initiation of the investigation in the case briefs would have been

unnecessary and moot, as the agency itself had already determined not to investigate the

upstream subsidy and Kenertec had no notice that Commerce would (or even could) reverse that

decision in the waning days of the investigation.

Moreover, Kenertec did sufficiently raise the issue at the appropriate time in its rebuttal

brief.  In its affirmative case brief, WTTC attempted to resuscitate the upstream subsidy issue.

And, as reflected in Commerce's IDM, Kenertec, in fact, stated clearly in its rebuttal brief that,

"to the extent that the Department revisits its upstream subsidy initiation and deferral decision,

the Department should conclude that Petitioner failed to meet both the statutory and regulatory

requirements and thus decline to initiate an investigation."  *See* IDM at 56-57 (citing Kenertec

Rebuttal Br. at 33, P.R. 251, C.R. 259).  Kenertec in its rebuttal brief also incorporated by

reference its extensive rebuttal comments to Petitioners' upstream subsidy allegations.  *See id*

(referring to Kenertec's Upstream Subsidy Allegation Rebuttal Comments, P.R. 220, C.R. 238).

Therefore, contrary to WTTC's arguments, Kenertec properly raised the issue before Commerce "at the time appropriate under its practice." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952)).

This Court has also held that exhaustion does not apply where, as here, the plaintiff party received a favorable preliminary result on the issue, and therefore would have had no reason to brief the issue affirmatively. *See Saha Thai Steel Pipe Co. v. United States*, 828 F. Supp. 57, 59-60 (Ct. Int'l Trade 1993) (holding that affirmative administrative briefing on the issue not required where a respondent was not adversely affected by a decision until the final determination); *Qingdao Taifa Group Co., Ltd. v. United States*, 637 F. Supp. 2d 1231, 1236-37 (Ct. Int'l Trade 2009). Here, with Commerce having initiated but deferred its upstream subsidy investigation, Kenertec had already received the precise relief it sought (*i.e.,* a CVD rate calculated without reference to upstream subsidies) and therefore had no reason to brief the issue affirmatively. Accordingly, the Court should disregard WTTC's exhaustion argument.

**III.    Commerce's Upstream Subsidy Investigation Was Legally and Factually Deficient**

While the Government has sought voluntary remand on the calculation issues Kenertec raised in this appeal, it has elected to defend Commerce's decision to take WTTC's allegations at face value and conduct no factfinding in its upstream subsidy "investigation." *See* Gov't Resp. Br. at Sec. III.C. In the Government's view, it was within Commerce's "discretion" to accept WTTC's allegations as fact, simply because Commerce found 20 years ago, on the basis of adverse facts available, that Krakatau Steel received countervailable subsidies. *Id*. at 55. Again, Krakatau POSCO, Kenertec's sole supplier of CTL plate during the POI, did not begin commercial operations until 2014. *See* Kenertec's Case Brief at 15, P.R. 246, C.R. 256 (citing Government of Indonesia's September 27, 2019 Initial Questionnaire Response at Exhibit GOI-CTL-13 (containing KP's 2018 Annual Report) at 8-9, P.R. 102, 105-109, C.R. 83, 86-91). As

discussed below, Commerce made no effort to determine whether the same subsidies provided 20

years ago to a different company (*i.e.,* Krakatau Steel) conferred benefits to or were otherwise

bestowed to Krakatau POSCO in 2018.  Commerce's logical leaps, which contained inferences

adverse to Kenertec on these questions, render its *Final Determination* both unsupported by

substantial evidence and contrary to law.

   A.   **Commerce's Regulations at 19 C.F.R. § 351.311 Required Commerce to
        Conduct an Investigation, Postpone the Investigation or Invite WTTC to
        Resubmit the Petition**

   The Government attempts to dismiss Kenertec's arguments regarding Commerce's

regulation, at 19 C.F.R. § 351.311, which sets forth the procedure for Commerce's consideration

of examining alleged subsidy programs not alleged in the petition.  Gov't Resp. Br. at 53.

Neither the Government nor WTTC has pointed to anything that would remedy Commerce's

failure to abide by the plain language of its regulations.

   First, the Government attempts to claim that 19 C.F.R. § 351.311 does not apply to

upstream subsidy allegations because the statute and the regulations contain other provisions

specific to upstream subsidies.  *See id*.  But the allegedly more specific provisions the

Government cites simply reference Commerce's authority to extend the final determination (in

an investigation) or final results (in a review).  They do not supersede Section 351.311, which, by

its plain terms, covers all "{countervailing subsidy practice{s} discovered during {an}

investigation or review."  The Government's argument also ignores that, in promulgating the

regulation, Commerce itself stated explicitly in the preamble that it was declining to limit its

applicability to any subset of practices alleged to be countervailable subsidies discovered during

the course of the ongoing segment of the proceeding.  *See Antidumping Duties; Countervailing

Duties*, 62 Fed. Reg. 27,296) (May 19, 1997) (stating unequivocally that "§ 351.311 is not

limited by its terms to particular types of subsidies.").

Second, the Government also argues that the regulation's reference in 19 C.F.R. § 351.311(b) to inclusion in the "proceeding," confers Commerce with discretion as to when the agency will examine the practice discovered.  *See id*. at 54.  In support of this argument, the Government points to the obvious fact that inclusion in a "proceeding" does not necessarily mean inclusion in a specific *segment* of the proceeding.  *See id.*  But the Government's argument misses the point.  The regulation, in fact, does specify how Commerce should handle new programs, like WTTC's upstream subsidy allegation, brought to the agency's attention light in one segment of the proceeding.  Specifically, after making the determination as to whether there is sufficient evidence to include the suspected countervailable subsidy in the proceeding, Commerce must determine whether "sufficient time remains before the scheduled date for the final determination or final results of review."  19 C.F.R. § 351.311(b).

Where, as here, Commerce concludes that insufficient time remains to examine a suspected subsidy, Commerce has two options in the investigation segment of the proceeding.  First, Commerce could "allow the petitioner to withdraw the petition without prejudice and resubmit it with an allegation with regard to the newly discovered practice, subsidy, or subsidy program{.}"  19 C.F.R. § 351.311(c)(1).  Alternatively, Commerce may "defer consideration of the newly discovered practice subsidy, or subsidy program until a subsequent administrative review, if any."  *Id.* § 351.311(c)(2).

The regulation makes clear that Commerce cannot reach a determination supported by substantial evidence without developing a record through the investigative process.  Where, as here, Commerce finds that insufficient time remains to conduct its investigation, the agency is not at liberty simply to take WTTC's allegations, premised on findings made 20 years ago, at face value and use them as the "facts available."  In essence, Commerce has attempted,

impermissibly, to write a third option into its regulations, purporting to allow the agency to make an evidence-free affirmative finding in a post-petition allegation when faced with a negative overall determination.  Commerce, of course, is not at liberty "under the guise of interpreting its regulation, to create *de facto* a new regulation."  *Christensen v. Harris*, 529 U.S. 576, 588 (2000).  Yet, that is precisely what the Government has argued Commerce may do here by conducting an evidence-free "investigation" when sufficient time did not remain for Commerce to fulfil its statutory obligation to investigate.

Finally, Kenertec notes that WTTC also makes similar arguments that the Court should not hold that Section 351.311 required Commerce either to conduct the required investigation, defer examination to a subsequent administrative review, or invite WTTC to withdraw the petition.  *See* WTTC Resp. Br. at 22.  WTTC's arguments are incorrect for the reasons discussed above.  In addition, WTTC's own actions during the investigation make clear that WTTC itself recognized that Commerce did not have the authority simply to issue a facts-free upstream subsidy determination.  Specifically, as the Final IDM makes clear, WTTC, in fact, argued before the agency that Commerce should extend the proceedings beyond the statutory deadline to examine its upstream subsidy allegation.  *See* Final IDM at Cmt. 6 ("Whether Commerce Should Extend the Final Determination to Investigate the Upstream Subsidy Allegation").  WTTC knows well that what Commerce did here was unsupportable.  The Court should, therefore, disregard WTTC's arguments.

**B.      The Government's Attempts to Distinguish the Contemporaneous *Staples from China* Case Must Fail**

The Government summarily states that the Court should pay no heed to Kenertec's arguments regarding the agency's statements in the *Staples from China* case.  *See* Gov't Resp. Br. at 56.  Contrary to the Government's (and WTTC's) arguments on this issue, the *Staples* case is

16

essentially the same fact pattern and Commerce's determination to defer in that case highlights just how arbitrary the agency's facts-free "investigation" was here.  Specifically, in *Staples*, the petitioner argued that Commerce had all of the information that it needed on the record in light of prior affirmative subsidy determinations in *Galvanized Steel Wire from China*, which is a primary input into staples.  *See Collated Steel Staples from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination*, 85 Fed. Reg. 33,626 (June 2, 2020), and accompanying IDM at Cmt. 7 ("*Staples* IDM").  There, Commerce sensibly held as follows:

> The information provided by the petitioner from *Galvanized Steel Wire from China* is relevant to the initiation of the Upstream Subsidy Allegation.  The record contains the petitioner's allegation and the accompanying supporting information, as well as responses from Best Nail and the GOC to initial questionnaires.  However, we have not gathered sufficient information from Best Nail or the GOC regarding the potential upstream subsidization of the inputs at issue.  Specifically, while the petitioner provided information sufficient to initiate an upstream subsidy investigation, and Best Nail and the GOC provided responses to initial questionnaires, this information does not provide a sufficient basis for rendering a final determination on whether producers of the subject merchandise in the instant case are benefitting from upstream subsidies, because Commerce determined that the "{i}nvestigation of the existence and extent of upstream subsidies on galvanized steel wire is a complex and time-consuming undertaking" which should be deferred to an administrative review.  As a result, the record of this investigation is insufficiently developed with regard to the existence of upstream subsidies.  Further, **each record stands on its own, and information from a prior proceeding (in this case, *Galvanized Steel Wire from China*) cannot substitute for a fully developed record in this case.**  As such, there are not sufficient "facts available" on the record of this investigation.  Therefore, we disagree with the petitioner that all the necessary facts to calculate an upstream subsidy benefit are on the record. Thus, Commerce acted within its statutory obligations in deferring the upstream subsidy investigation to the first administrative review pursuant to section 703(g)(2)(B)(i) of the Act.

*Id.* (footnotes omitted) (emphasis supplied).  The facts discussed in the *Staples* IDM are virtually indistinguishable from the facts of this case.  As Commerce itself recognized in *Staples*, the agency was permitted to conduct an upstream subsidy analysis only on a "fully developed

record," and that "in order to ensure a complete record upon which it could base a determination of this program, Commerce would have needed to issue additional questionnaires to the GOC, Best Nail and potentially its suppliers of galvanized steel wire." *Id.*

Commerce correctly recognized in *Staples* that more is required than stale findings from a prior CVD investigation on an input to build a record in an upstream subsidy investigation. Commerce in *Staples* also correctly recognized that simply grafting a 2012 final determination in a prior investigation was inappropriate, and that further factfinding was necessary to conduct a proper investigation. *See id.* at Cmt. 7. Thus, contrary to the Government's attempts to distinguish *Staples*, Commerce's holdings in that case make clear that in this case, in the absence of any record developed through the investigative process, Commerce arbitrarily reached an unsupported determination as there is no evidence to support it. *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.") (alterations added).

**C.    Commerce's Facts-Free Upstream Subsidy Investigation Was a *De Facto* AFA Determination Made Unlawfully Against a Fully Cooperative Respondent**

The Government and WTTC both claim that the statute allows Commerce to issue affirmative findings without issuing questionnaires or otherwise conduct any factfinding. *See* Gov't Resp. Br. at 57; WTTC Resp. Br. at 18. To the contrary, the statute, at 19 U.S.C. § 1677m, sets forth a carefully calibrated set of procedures governing the "{c}onduct of investigations and administrative reviews." That framework necessarily requires Commerce to collect information from the respondent companies, the foreign government, and, in the case of upstream subsidy investigations, potentially the input supplier. Indeed, as Commerce itself correctly recognized in *Staples*, Commerce may not reach an affirmative determination when the only "facts available" are a petitioner's allegation and stale findings from another proceeding. *See* Staples IDM at Cmt.

7.  Moreover, even if Commerce can, under some theory, issue a determination without gathering any facts, that does not mean that the resulting determination would be supported by substantial record evidence.

The Government cannot be heard to claim that Commerce has the authority to reach an affirmative upstream subsidy determination where it does not seek any information from the respondent companies or government.  Under the Government's logic, Commerce would be free simply to take a petitioner's allegations (in this context or in any other investigation) at face value, relying on those untested allegations as "the facts otherwise available."  There would be no need for questionnaires or verifications of the responses to those questionnaires.  Commerce knows well that its actions here were improper.  Indeed, as Commerce itself recognized very explicitly in *Staples*, "information from a prior proceeding . . . cannot substitute for a fully developed record" in its upstream subsidy analysis.  *Id.*

Commerce's "investigation," relying solely on decades-old proceedings and WTTC's allegations necessarily involved inferences adverse to Kenertec.  For example, Commerce inferred adversely to Kenertec that the rates calculated twenty years ago in *CTL Plate from Indonesia* remained valid and applicable to Kenertec's CTL plate inputs.  In fact, the rates for the Loan Rediscount and Two-Step Loan programs from the 1999 investigation used to calculate Kenertec's subsidy rate themselves were based on adverse inferences.  *See* Kenertec Br. at 36.  Commerce, of course, is not at liberty to make inferences adverse to a respondent unless a respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce.  *See* 19 U.S.C. § 1677e(b)(1).  That is precisely what Commerce did here in accepting Petitioners' allegations as fact.  Its facts-free "investigation" was, therefore, contrary to law.

Further, at a more fundamental level, Commerce was charged with determining whether an upstream subsidy existed.  Commerce had no actual evidence one way or another to answer this question, and instead resorted to the facts available and determined that an upstream subsidy did exist.  Leaving all else aside, that facts available determination itself *was adverse to Kenertec's interests*.  Thus, at the most basic level, Commerce reached a determination that, for all intents and purposes, was a facts available determination under 19 U.S.C. § 1677e(a) and reached a conclusion that constituted "adverse inferences," under 19 U.S.C. § 1677e(b), yet did so without basis or reference to the statutory provisions governing the use of adverse inferences. Thus, Commerce's facts available conclusion that an upstream subsidy existed and Commerce's quantification of an upstream subsidy rate are both unlawful and unsupported adverse facts available determinations.

The Court should not countenance Commerce's attempt to reach a determination free from any relevant facts and based solely on unwarranted (and unlawful) adverse inferences.  The Court should order the agency to reverse its "findings" based on nothing more than unsubstantiated allegations.  In this case, Commerce has not relied on neutral facts available to fill a gap in the record.  Rather, Commerce impermissibly has used adverse facts available as a substitute for the entire record as to whether an upstream subsidy exists.  Such a decision turns the entire statutory framework on its head, and necessarily is one that is based on "a record that contains no evidence on which the {agency} could rationally base its decision."  *Sterling Fed. Sys. Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting *Gerritsen v. Shirai*, 979, F.2d 1524, 1529 (Fed. Cir. 1992).  Accordingly, the Court should hold that Commerce's decision amounted to an abuse of discretion and that Commerce should amend its *Final Determination* to exclude any subsidy rate related to the uninvestigated upstream subsidy allegation.

**IV.    WTTC's Arguments Regarding Commerce's Upstream Subsidy Benefit Calculation Are Moot**

As the Court is aware, Commerce has declined to defend any aspect of its upstream subsidy calculation, opting instead to move the Court for a partial voluntary remand on this issue on the day that its response brief was due.  *See* Def. Mot. Voluntary Remand.  While WTTC's response brief contained a host of defenses of Commerce's upstream subsidy calculation, WTTC did not object to Commerce's motion for voluntary remand.  On July 20, the Court granted Commerce's motion for voluntary remand, with instructions for Commerce to render "a simple decision on whether the subsidy at issue is an export subsidy, which may not be included in upstream subsidy calculation" by August 19, 2021.  *See* ECF No. 38.  The Court further ordered the parties to advise the Court by August 23, 2021 if supplemental briefing is required, and if so, to propose an "expeditious schedule."  *Id.*  On August 3, 2021, Commerce issued its draft remand results, removing the export subsidy from its calculations, resulting in a *de minimis ad valorem* subsidy rate for Kenertec.

In light of the Court's July 20 Order, and Commerce's draft remand results, Kenertec submits that WTTC's arguments in support of calculation methodologies are now moot.  That said, Kenertec refers the Court's attention to Kenertec's opening brief at 35-44.  Therein Kenertec demonstrates that Commerce's calculations were unlawful and unsupported by substantial record evidence as they (1) impermissibly included an export subsidy in the calculated upstream subsidy rate, (2) included adverse facts available rates in the calculations, and (3) failed to appropriately attribute any upstream subsidy on CTL inputs to subject wind towers.  None of WTTC's arguments can rehabilitate Commerce's illogical and unlawful calculations on these points.  Indeed, while the Government requested a voluntary remand with respect to item (1) above, the Government neither defended nor requested a remand with respect

to items (2) or (3).  While Kenertec believes these issues are largely mooted by the Government's remand proceeding, these elements of Commerce's calculations remain unlawful and unsupported.  Accordingly, in any scenario where Commerce otherwise seeks to calculate an above *de minimis* subsidy rate for Kenertec, the Court should instruct Commerce to recalculate any upstream subsidy rate such that it excludes adverse facts available rates from the calculation and attributes the upstream subsidy appropriately to subject wind towers (rather than simply treating the subsidy rate for CTL inputs as the subsidy rate for subject wind towers).

Finally, consistent with the Court's July 20 Order, Kenertec will consult with the other parties in this case concerning whether additional briefing on this topic is appropriate and, if necessary, to propose a separate briefing schedule after Commerce issues its remand results on the calculation issues with the Court.

## V.    Conclusion

For the foregoing reasons, Kenertec respectfully requests that this Court reverse and find contrary to law or unsupported by substantial evidence the foregoing aspects of Commerce's *Final Determination*.

Respectfully submitted,

 /s/ J. David Park
J. David Park
Henry D. Almond
Daniel R. Wilson
Kang Woo Lee
Henry B. Morris
*Counsel to PT. Kenertec Power System*

Phyllis L. Derrick
Eric Johnson
*Consultant to PT. Kenertec Power System*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone:  (202) 942-5000
Fax:  (202) 942-5999
E-mail:  David.Park@apks.com

**Dated:  August 6, 2021**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JANE RESTANI, SENIOR JUDGE**

| | |
|---|---|
| PT. KENERTEC POWER SYSTEM, | ) |
| | ) |
|         **Plaintiff,** | ) |
|     **and** | )    **Court No. 20-03687** |
| | )    **(Consol.)** |
| WIND TOWER TRADE COALITION, | ) |
| | ) |
|         **Consolidated Plaintiff,** | ) |
| | ) |
|   **v.** | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
|         **Defendant,** | ) |
| | ) |
|     **and** | ) |
| | ) |
| PT. KENERTEC POWER SYSTEM and | ) |
| WIND TOWER TRADE COALITION, | ) |
| | ) |
|         **Defendant-Intervenors.** | ) |

## CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Reply Brief filed by Plaintiff PT. Kenertec Power System, dated August 6, 2021, contains 6,763 words according to the word count function of the word-processing system used to prepare this memorandum, exclusive of the table of contents, table of authorities, and counsel's signature block, and therefore complies with the maximum 7,000 word count limitation set forth in the Court's Chambers Procedures.

By:    /s/ J. David Park
             J. David Park

**Dated:  August 6, 2021**