NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

PT. KENERTEC POWER SYSTEM and WIND TOWER TRADE COALITION,

        Plaintiff and Consolidated Plaintiff,

    v.

UNITED STATES,

        Defendant,

    and

WIND TOWER TRADE COALITION and PT. KENERTEC POWER SYSTEM,

        Defendant-Intervenor and Consolidated Defendant-Intervenor.

Before: Hon. Jane A. Restani,
      Senior Judge

Consol. Court No. 20-03687

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information Removed from Pages 2-7, 16, 17, 21

## <u>WIND TOWER TRADE COALITION'S REPLY BRIEF</u>

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: August 6, 2021

Consol. Ct. No. 20-03687                                      NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................... 1

II.     ARGUMENT ............................................................................................. 1

        A.      Commerce Erred in Finding that Krakatau POSCO Was Not an
                "Authority" Under the Statute ................................................................. 1

                1.      Commerce Erred by Disregarding Key Evidence Regarding
                        Krakatau POSCO's Board of Commissioners and by
                        Reaching a Conclusion Regarding Krakatau POSCO's
                        Board of Directors that Was Contrary to the Record .................... 1

                2.      The Exhaustion Doctrine Does Not Preclude Consideration
                        of the WTTC's Claims Regarding Krakatau POSCO's Board
                        of Directors and Krakatau POSCO's Reliance on Krakatau
                        Steel for the Production of Its Facilities ...................................... 8

                3.      Commerce Improperly Disregarded Additional Evidence
                        and Relevant Past Precedent Regarding the Issue of
                        "Meaningful Control" of Krakatau POSCO ............................... 10

        B.      Commerce Erred in Reversing Its Preliminary Determination and
                Finding that the Government of Indonesia Did Not Entrust and
                Direct Krakatau POSCO to Provide Cut-to-Length Plate for Less
                Than Adequate Remuneration ............................................................... 14

                1.      Commerce's Final Determination on Entrustment and
                        Direction was Not Supported by Substantial Evidence and
                        Otherwise Unlawful ................................................................... 14

                2.      Commerce Unlawfully Deviated from its Preliminary
                        Determination Without Adequate Justification and Based on
                        the Same Evidence ..................................................................... 21

III.    CONCLUSION ....................................................................................... 23

Consol. Ct. No. 20-03687                                          NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altx, Inc. v. United States*,
25 CIT 1100, 167 F.Supp.2d 1353 (2001), *aff'd*, 370 F.3d 1108 (Fed. Cir.
2004) ...................................................................................................................3

*Borusan Mannesmann Boru Sanayi Ve Ticaret v. United States*,
61 F.Supp.3d 1306 (Ct. Int'l Trade 2015) ............................................................1

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)................................................................... *passim*

*DAK Ams. LLC v. United States*,
456 F.Supp.3d 1340 (Ct. Int'l Trade 2020) ........................................................14

*Diamond Sawblades Mfrs. Coal. v. United States*,
866 F.3d 1304 (Fed. Cir. 2017)..............................................................................5

*Hynix Semiconductor Inc. v. United States*,
29 CIT 995, 391 F.Supp.2d 1337 (2005) .............................................................15

*Micron Tech., Inc. v. United States*,
31 CIT 2031, 535 F.Supp.2d 1336 (2007)............................................................15

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto.
Ins. Co.*,
463 U.S. 29 (1983)..............................................................................................4, 18

*Nexteel Co. v. United States*,
355 F.Supp.3d 1336 (Ct. Int'l Trade 2019) ...........................................13, 21, 22

*NSK Corp. v. United States*,
32 CIT 1497, 593 F.Supp.2d 1355 (2008) ...........................................................13

*Qingdao Taifa Grp. Co. v. United States*,
33 CIT 1090, 637 F.Supp.2d 1231 (2009) .............................................................9

*SKF USA Inc. v. United States*,
263 F.3d 1369 (Fed. Cir. 2001)............................................................6, 7, 15, 18

**Administrative Materials**

*Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg.
41,964 (Dep't Commerce July 18, 2014)..............................................................13

Consol. Ct. No. 20-03687                          NON-CONFIDENTIAL VERSION

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,349 (Dep't Commerce Nov. 25, 1998) ....................................................................................................................14

*Supercalendered Paper From Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) ................................................................................................................15

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......................................14

Consol. Ct. No. 20-03687                                      NON-CONFIDENTIAL VERSION

## I.      INTRODUCTION

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the
following reply to the July 9, 2021 response briefs filed by Defendant the United States
("Defendant") and PT. Kenertec Power System ("Kenertec").   *See* Def.'s Opp'n to Pl.'s and
Consol. Pl.'s R. 56.2 Mots. For J. on the Agency R. (July 9, 2021), ECF No. 33 ("Def. Br."); PT.
Kenertec Power System's Resp. Mot. in Opp'n to Consol. Pl. Rule 56.2 Mot. for J. Upon the
Agency R. (July 9, 2021), ECF No. 30 ("Kenertec Br.").

## II.     ARGUMENT

### A.      Commerce Erred in Finding that Krakatau POSCO Was Not an "Authority" Under the Statute

Commerce erred in concluding that Krakatau POSCO did not act as an "authority" within
the meaning of section 771(5)(B) of the Act during the POI and thus that Krakatau POSCO's sales
of CTL plate to Kenertec did not constitute financial contributions under section 771(5)(D)(iii) of
the Act.  *See* Issues and Decision Memorandum accompanying *Utility Scale Wind Towers From
Indonesia*, 85 Fed. Reg. 40,241 (Dep't Commerce July 6, 2020) at cmt. 1, P.R. 259 ("IDM").
Defendant's and Kenertec's arguments to the contrary should be rejected.  *See* Def. Br. at 17-29;
Kenertec Br. at 14-27.

#### 1.      Commerce Erred by Disregarding Key Evidence Regarding Krakatau POSCO's Board of Commissioners and by Reaching a Conclusion Regarding Krakatau POSCO's Board of Directors that Was Contrary to the Record

In defense of Commerce's action, Kenertec first asserts: "{t}hat Krakatau POSCO is not
majority-owned by the government should be dispositive in this case on the question of whether
Krakatau POSCO is an 'authority.'"  Kenertec Br. at 15.  But that is not the standard applied by
the agency, as recognized by this Court.  *See Borusan Mannesmann Boru Sanayi Ve Ticaret v.*

*United States*, 61 F.Supp.3d 1306, 1314, 1320 (Ct. Int'l Trade 2015).  Even Defendant explicitly acknowledges that Krakatau POSCO could be a government "authority" even without majority government ownership, and that Commerce has made such findings in the past.  Def. Br. at 17-18.  However, Defendant continues, after considering all other record evidence regarding Krakatau POSCO's management and operations, Commerce concluded that the Indonesian government did not have meaningful control over Krakatau POSCO.  *Id.* at 18.  While this is an accurate statement of Commerce's finding, it is an unreasonable finding that was not supported by substantial record evidence.

First, Defendant explains, Commerce "examined Krakatau POSCO's management structure," including its Board of Directors ("BOD") and Board of Commissioners ("BOC").  *Id.* Defendant notes that POSCO appointed the majority of the BOD, while POSCO and Krakatau Steel each appointed two members of the BOC, with Krakatau Steel appointing the President Commissioner.  *Id.* at 18-19.  Defendant then states that Commerce concluded that the BOC's duties were "limited to [                                    ]," and so Defendant effectively admits that Commerce excluded any analysis of the BOC from its decision.[1]  *Id.* at 19.  In other words, while Commerce listed some limited facts with regard to the BOC in its final determination, Commerce only "analyzed POSCO's and Krakatau Steel's involvement in the Board of <u>Directors</u> to determine whether the Indonesian government had meaningful control over Krakatau POSCO's business operations."  *Id.* (emphasis added).  *See also id.* at 23-24.

Exclusion of the BOC's role from the analysis of meaningful control was unreasonable, and it shows that Commerce failed to take into account "whatever in the record fairly detracts"

---

[1]       Defendant-Intervenor Kenertec appears to disagree with Defendant's admission, arguing that "Commerce accounted for the substantial record evidence regarding Krakatau POSCO's BOC and its role."  Kenertec Br. at 19.  This is belied by Commerce's own analysis and determination.

from the evidence adduced in support of the agency's conclusion and failed to address significant arguments of the WTTC that undermined its conclusion. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Altx, Inc. v. United States*, 25 CIT 1100, 1117-18, 167 F.Supp.2d 1353, 1374 (2001), *aff'd*, 370 F.3d 1108 (Fed. Cir. 2004).  In its own preliminary determination, Commerce found that "Krakatau POSCO's BOC is the <u>ultimate supervisory organ of the company</u>," recognizing the importance of the BOC to control over the company. Preliminary Decision Memorandum accompanying *Utility Scale Wind Towers From Indonesia*, 84 Fed. Reg. 68,109 (Dep't Commerce Dec. 13, 2019) at 10, P.R. 183 ("PDM") (emphasis added). The following statements in [                                                                    ] further demonstrate the critical nature of the BOC:

- "[



  ].

Letter from the Directorate Gen. of Foreign Trade to Andrew Medley, U.S. Dep't of Commerce, re: *Utility Scale Wind Towers from Indonesia: Submission on GOI's Questionnaire Response* (Sept. 27, 2019) at Exhibit GOI-CTL-13, p. 195, C.R. 83-110, P.R. 102-128 ("GOI IQR").

- [

                                                                                    ];

- [



                                                                            ];

- [

                                                      ];

- [

].

*Id.* at Exhibit GOI-CTL-12.  *See also* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers From Indonesia: Case Brief* (Apr. 17, 2020) at 7-8, C.R. 255, P.R. 245.  There is simply no reason to [

], other than to ensure that Krakatau Steel (and by extension the GOI) had the ability to exercise meaningful control over Krakatau POSCO.  Yet, as Defendant acknowledges, Commerce's determination disregarded this key evidence.  As such, Commerce improperly disregarded evidence that detracted from its conclusion and failed to grapple with all "important aspect{s} of the problem" before it.  *CS Wind*, 832 F.3d at 1373; *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Even Commerce's analysis of the BOD alone was flawed.  Defendant notes Commerce's conclusion that the record evidence did not suggest that the Indonesian government or Krakatau Steel "had <u>any means</u> to exert meaningful control over Krakatau POSCO during the POI such that it would be considered to possess or exercise government authority."  Def. Br. at 20-21 (citing IDM at 32).  This is flatly contradicted by the record evidence.  In its brief, Defendant merely restates Commerce's conclusion that "'Krakatau POSCO's BOD may adopt binding resolutions without any involvement by Krakatau Steel or its appointed directors' because POSCO's four members represented a majority whether a quorum exists in the initial meeting or the postponed meeting."  *Id.* at 20 (citing Memorandum from Melissa Kinter, through Rebecca Janz, to The File, re: *Countervailing Duty Investigation of Utility Scale Wind Towers from Indonesia: Additional Analysis Regarding the Final Determination* (June 29, 2020) at 2, C.R. 263, P.R. 262 ("Final Determination Add'l Analysis Memo")).

4

Neither Commerce below nor Defendant now recognize that public body Krakatau POSCO can also represent a majority, in a postponed meeting.  Given that a [

] are nominated by Krakatau Steel, Krakatau POSCO's BOD may adopt binding resolutions <u>solely based on the votes of Krakatau Steel's appointees</u>, without any votes from POSCO's appointed directors.  In other words, there are circumstances under which majority state-owned Krakatau Steel's directors can be directly responsible for BOD decisions – decisions [

]" of Krakatau POSCO.  In the non-market economy separate rate context, this Court has recognized in the past that a state-owned entity's ability to appoint Board members and control a company's BOD is an important indicia of government control.  *See Diamond Sawblades M,frs. Coal. v. United States*, 866 F.3d 1304, 1308 (Fed. Cir. 2017).

While Kenertec paints these circumstances as a "speculative and fanciful scenario," Kenertec Br. at 17, there is nothing speculative nor fanciful about them, and they would not represent "some sort of coup."  *Id.*  These are the rules for Krakatau POSCO's BOD decision making, as explicitly outlined in the company's Articles of Association.  *See* Final Determination Add'l Analysis Memo at 1-2.  Those rules clearly and intentionally provide for circumstances under which GOI state-owned entity Krakatau Steel can adopt binding resolutions for Krakatau POSCO based solely on its own directors' votes.

Defendant notes that "the {BOD} cannot adopt binding resolutions without <u>any</u> involvement by POSCO and its appointed directors," because one POSCO director would need to at least be present at a meeting to have a quorum.  *See* Def. Br. at 23.  Particularly combined with the Krakatau Steel-controlled BOC's authority to [                          ], that does not outweigh the fact that Krakatau Steel's BOD members could then out-vote the POSCO BOD

BUSINESS PROPRIETARY INFORMATION<br>HAS BEEN DELETED    NON-CONFIDENTIAL VERSION

member, providing Krakatau Steel with a clear and feasible "means" to exert meaningful control over Krakatau POSCO.

> Further, Defendant notes:

> Certain long-term operational and investment decisions require approval by the General Meeting of Shareholders with a quorum of 80 percent of shareholders needed for the first and second meetings (if no quorum in the first meeting).  Id.  POSCO's [

> ] these long-term decisions for Krakatau POSCO.  At the same time, however, neither POSCO nor Krakatau Steel possesses veto power over [                    ] because an [

> ].

Def. Br. at 20 (emphasis added).  As previously noted, POSCO owns 70% of Krakatau POSCO's outstanding shares, and Krakatau Steel owns the remaining 30%.  IDM at 32.  The [

]; it was clearly designed to ensure that

[                                                                                    ].  Thus, Defendant acknowledges that POSCO is unable to make certain long-term operations and investment decisions for Krakatau POSCO on its own, providing Krakatau Steel yet another "means" to exert meaningful control over Krakatau POSCO.  In addition to failing to adequately account for this incredibly persuasive evidence of control, *CS Wind*, 832 F.3d at 1373, Commerce's conclusion, in the face of this evidence, that Krakatau Steel did not have "any means" to exert meaningful control over Krakatau POSCO was inadequately explained.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1378 (Fed. Cir. 2001).

> Kenertec states that the WTTC's argument regarding the major decisions that require [

> ] "lacks any bite because the company decisions that require [

> ] are not linked to the alleged financial contribution, *i.e.*, the

production, sales, and pricing decisions relating to Krakatau POSCO's supposed provision of CTL plate to Kenertec for less than adequate remuneration." Kenertec Br. at 21. First, and again, Kenertec cites an incorrect standard. The agency is assessing whether the entity is "meaningfully controlled" by the government. IDM at 31. Second, the actions that require [

] are so fundamental to Krakatau POSCO's operations that they would indeed relate to the company's provision of CTL plate to other entities, such as Kenertec. For example, [

]. GOI IQR at Exhibit GOI-CTL-12, [                                ].
Each of these decisions would have a substantial impact on the production, sales and pricing decisions related to Krakatau POSCO's provision of CTL plate to Kenertec at less than adequate remuneration.

On these facts, Commerce's conclusion that Krakatau Steel did not have "any means to exert meaningful control over Krakatau POSCO" is unsupported by substantial record evidence, unreasonable, inadequately explained, grounded in evidentiary sources that are inadequate to support its conclusions and otherwise inconsistent with law. *SKF USA*, 263 F.3d at 1378. Contrary to Commerce's finding, Krakatau Steel had various means by which to exert meaningful control over Krakatau POSCO, requiring remand of the agency's decision.

Consol. Ct. No. 20-03687                                    NON-CONFIDENTIAL VERSION

> **2.    The Exhaustion Doctrine Does Not Preclude Consideration of the WTTC's Claims Regarding Krakatau POSCO's Board of Directors and Krakatau POSCO's Reliance on Krakatau Steel for the Production of Its Facilities**

Defendant argues briefly that the "WTTC failed to exhaust its administrative remedies by not raising {the} new argument regarding the {BOD's} quorum rules in its administrative case brief" and that the WTTC also waived the argument that Commerce failed to "consider Krakatau POSCO's reliance on Krakatau Steel for, among other things 'the production of its facilities.'" Def. Br. at 22, 25.  However, the agency's preliminary decision differed significantly from the agency's final determination.  At the time that administrative case briefs were filed, the WTTC had no way to know or reason to believe that these issues would be under contention for the final determination.

For example, with regard to the BOD quorum rules, the WTTC had no reason to suspect that Commerce in the final determination would completely disregard the authority of Krakatau POSCO's BOC and focus solely on the BOD, rendering further detailed analysis of the BOD quorum requirements necessary.  To the contrary, in the preliminary determination, Commerce stated:

> Krakatau POSCO's BOC is the ultimate supervisory organ of the company. Further, for certain proprietary reasons, we find that the record supports a finding that Krakatau Steel is capable of exercising some authority over Krakatau POSCO's BOC, and consequently, Krakatau POSCO, in a manner that is greater than might be indicated by the total shares of Krakatau POSCO which are held by Krakatau Steel.  As a result of this disproportionate authority over the BOCs, Krakatau Steel, and by extension the GOI, has the ability to exert a greater degree of influence over Krakatau POSCO than its minority shareholding would suggest.

PDM at 10.

Commerce did not in its preliminary determination rely upon the BOD's composition or quorum rules in finding that Krakatau POSCO was not an "authority."  *See id.   See also*

Memorandum from Melissa Kinter, through Shawn Thompson, to The File, re: *Countervailing Duty Investigation of Utility Scale Wind Towers from Indonesia: Additional Analysis Regarding the Preliminary Determination that the Government of Indonesia Entrusts or Directs Private Entities to Provide a Financial Contribution to PT Kenertec Power System* (Dec. 6, 2019) at 1-2, C.R. 224, P.R. 189.  Thus, while the WTTC discussed in detail the authorities of the BOC in its case brief (the apparent focus of Commerce's preliminary determination) in addition to other evidence, it reasonably did not raise the detailed issue regarding the BOD's quorum requirements in its case brief.

Similarly, the WTTC had no reason to believe that Commerce would fail to take Krakatau POSCO's reliance on Krakatau Steel for the production of its facilities into account in the final determination.  In fact, despite its ultimate conclusion on the authority issue, Commerce directly found in the final determination that:

> Krakatau POSCO depends on Krakatau Steel for the production of its facilities and for the provision of water, electricity, and access to the port for raw materials. Additionally . . . Krakatau Steel has the right, under the terms of the joint venture agreement, to purchase up to one million metric tons of slab per year from Krakatau POSCO and . . . $629 million U.S. dollars in transactions occurred between Krakatau Steel and Krakatau POSCO in 2018.

IDM at 28-29.

> A party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level.

*Qingdao Taifa Grp. Co. v. United States*, 33 CIT 1090, 1093, 637 F.Supp.2d 1231, 1236 (2009) (citing *LTV Steel Co. v. United States*, 985 F.Supp.95, 120 (Ct. Int'l Trade 1997)).  The Court should therefore find that the exhaustion doctrine does not preclude its review of the WTTC's claims.

Consol. Ct. No. 20-03687                                    NON-CONFIDENTIAL VERSION

    **3.**    **Commerce Improperly Disregarded Additional Evidence and Relevant Past Precedent Regarding the Issue of "Meaningful Control" of Krakatau POSCO**

Defendant next states that the WTTC "argues that Commerce was required to apply here a five-factor test that it had previously used to determine whether an entity is governmental authority," noting that the applicability of the test as a routine practice is "debatable." Def. Br. at 21. Defendant misstates the WTTC's argument. The WTTC did not argue that Commerce was required by past practice to adhere to the five-factor test specifically, but that Commerce must consider key record evidence – much of which would have been considered under the five-factor test – in its holistic analysis of whether Krakatau POSCO is an "authority." *See* Wind Tower Trade Coalition's Rule 56.2 Mot. for J. on the Agency R. (Apr. 7, 2021), ECF No. 21 at 15 n.3 ("WTTC Opening Br.").

Among the evidence that was improperly disregarded was a 2017 *Jakarta Post* article that described the relationship between the GOI and Krakatau POSCO and quoted the head of the Indonesian Investment Coordinating Board ("BKPM"). *See* PDM at 11; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers From Indonesia: Submission of Other Factual Information and Benchmark Information* (Nov. 7, 2019) at Exhibit 7, C.R. 189-191, P.R. 166-168 ("WTTC Benchmark Submission"). The head of BKPM stated that Krakatau POSCO "almost collapsed four years ago, and two years ago President Joko 'Jokowi' Widodo ordered <u>direct intervention</u> to ensure its survival." *Id.* (emphasis added). The article also stated that, according to GOI Industry Minister Airlangga Hartarto, "the Indonesian government planned to intervene by integrating the steel supply chain between local steel makers and domestic buyers." *Id.* "In its plan, steel makers . . . Krakatau Steel, Krakatau POSCO . . . will be directed to supply local industries . . . ." *Id.*

Consol. Ct. No. 20-03687                                    NON-CONFIDENTIAL VERSION

Defendant attempts to dismiss as "threadbare" this clear statement by a GOI official that the GOI directly intervened to ensure Krakatau POSCO's survival. Such a dismissal is not reasonable. With no response for this evidence, Defendant simply states: "Nonetheless, Commerce explained that other record evidence (*e.g.*, minority government ownership and the non-controlling presence in the overall operations of the company) weighed in favor of finding that the Indonesian government does not exert meaningful control over Krakatau POSCO." Def. Br. at 25. But Commerce cannot simply ignore evidence that detracts from its conclusion, *see CS Wind*, 832 F.3d at 1373, particularly when that evidence is supported by a plethora of additional record evidence.

Kenertec, for its part, notes that this article does not indicate that Krakatau POSCO is a government authority because, "{w}hen asked directly about this article, GOI officials explained to Commerce that the only intervention or integration undertaken was simply that the 'GOI has taken steps to encourage linkages between domestic producers and consumers – for example in the form of hosting exhibitions.'" Kenertec Br. at 22 (citing Memorandum from Andrew Medley, through Melissa G. Skinner, Dir., to The File, re: *Verification of the Questionnaire Responses of the Government of Indonesia* (Apr. 1, 2020) at 9, P.R. 238 ("GOI Verification Report")). The idea that the BKPM government official – in stating that Krakatau POSCO "almost collapsed four years ago, and two years ago President Joko 'Jokowi' Widodo ordered <u>direct intervention</u> to ensure its survival" – meant that the President of Indonesia directly intervened in the form of "<u>hosting exhibitions</u>" to ensure Krakatau POSCO's survival is implausible.

Defendant and Kenertec also both defend Commerce's dismissal of evidence regarding Krakatau POSCO's efforts to promote the GOI's "Master Plan of National Industry Development 2015-2035 of the Republic of Indonesia." Def. Br. at 26-27; Kenertec Br. at 24-25. Pursuant to

the RIPIN, the GOI identified a project to develop a steel cluster in Cilegon, including both Krakatau Steel and Krakatau POSCO and adjacent to Kenertec, to produce 10 million tons of steel by 2025, to integrate upstream and downstream steel sectors, and to reduce or eliminate dependence on steel imports. *See* PDM at 10; Letter from the Directorate Gen. of Foreign Trade to Shawn Thompson, U.S. Dep't Commerce, re: *Utility Scale Wind Towers from Indonesia: Submission on GOI's First Supplemental Questionnaire Response* (Nov. 4, 2019) at 21, C.R. 148-149, P.R. 156-157 ("GOI SQR"). As the GOI explained in its supplemental questionnaire response, "{t}he {cluster} project is included in the RIPIN as part of <u>domestic steel industry's contribution to support GOI master plan</u> to develop industry sector by 2035." GOI SQR at 21 (emphasis added). This evidence of Krakatau POSCO's cooperation with state-owned Krakatau Steel to pursue governmental policies or interests indicated that Krakatau POSCO was an authority.

Kenertec argues that Commerce initially misunderstood the RIPIN due to an imprecise statement by the GOI. Kenertec Br. at 24. That allegedly "imprecise statement" by the GOI – that the Cilegon cluster project was included in the RIPIN to support the GOI's master plan – was actually quite clear and precise. GOI SQR at 21. Commerce's decision to accept the GOI's "correction" (*i.e.*, complete reversal) of this statement, stating instead that the Cilegon cluster was a purely commercial goal set by Krakatau Steel and Krakatau POSCO, was unreasonable. *See* Letter from the Directorate Gen. of Foreign Trade to Andrew Medley, U.S. Dep't Commerce, re: *Utility Scale Wind Towers from Indonesia: Minor Correction to GOI Response to the 1st Supplemental Questionnaire 4 November 2019* (Mar. 5, 2020) at 1, P.R. 226 ("GOI Minor Corrections"); GOI Verification Report at 2. Commerce unreasonably accepted this "correction" at verification even though the GOI failed to provide at verification information, including with

regard to the RIPIN, that could have elucidated the issue, as outlined in the WTTC's opening brief. *See* WTTC Opening Br. at 34-36. With no substantiated, reliable new evidence on the record to justify a change in position, it was unreasonable for Commerce to reverse its position on from the preliminary to the final phase of the investigation. *See Nexteel Co. v. United States*, 355 F.Supp.3d 1336, 1351 (Ct. Int'l Trade 2019).

Finally, Defendant argues that the OCTG from Turkey proceeding discussed in the WTTC's brief was "inapposite," because the Turkish entity at issue in that case effectively had majority government ownership. Def. Br. at 28. *See* WTTC Opening Br. at 14-15. *See also* Kenertec Br. at 26-27. But Commerce explicitly discussed the relevant Turkish steel producer in that case as having minority government ownership, like Krakatau POSCO here. *See* Issues and Decision Memorandum accompanying *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't Commerce July 18, 2014) at 22 and cmt. 1 ("enterprises with little or no formal government ownership can still be considered public bodies if the government exercises meaningful control over them"). It was not simply the Turkish entity's level of government ownership, but also additional factors outlined by the agency, that led Commerce to conclude that the Turkish company was an "authority."

Moreover, it is not only the WTTC that found the line of cases relevant to the underlying proceeding; Commerce itself in the final determination outlined these prior rulings with regard to how it assesses whether a minority government-owned entity is an "authority" under the statute. *See* IDM at 32. Commerce's explicit citation to these cases, while making determinations in the underlying case directly contrary to its prior findings in the Turkey cases, *see* WTTC Opening Br. at 27-30, was unreasonable and unlawful. An agency "may not disregard previous findings of a general nature that bear directly upon the current {proceeding}." *NSK Corp. v. United States*, 32

CIT 1497, 1511, 593 F.Supp.2d 1355, 1369 (2008) (quoting *Usinor v. United States*, 26 CIT 767,

792 (2002)). "{I}f there are distinguishing factors between the prior determinations in question

and the instant case, the burden is on the {agency} to reasonably address them." *DAK Ams. LLC

v. United States*, 456 F.Supp.3d 1340, 1354 (Ct. Int'l Trade 2020) (assessing a finding of the

International Trade Commission).

> **B.    Commerce Erred in Reversing Its Preliminary Determination and Finding
> that the Government of Indonesia Did Not Entrust and Direct Krakatau
> POSCO to Provide Cut-to-Length Plate for Less Than Adequate
> Remuneration**

> **1.    Commerce's Final Determination on Entrustment and Direction was
> Not Supported by Substantial Evidence and Otherwise Unlawful**

Commerce's final determination that the GOI did not entrust and direct Krakatau POSCO

to provide CTL plate for LTAR – in a direct reversal of its preliminary determination – was

unsupported by substantial record evidence and otherwise unlawful.

As the legislative history made clear, "the Administration intends that the 'entrusts or

directs' standard shall be interpreted broadly. The Administration plans to continue its policy of

not permitting the indirect provision of a subsidy to become a loophole when unfairly traded

imports enter the United States and injure a U.S. industry." Uruguay Round Agreements Act,

Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 926 (1994), *reprinted in*

1994 U.S.C.C.A.N. 4040, 4239. *See also Countervailing Duties*, 63 Fed. Reg. 65,348, 65,349

(Dep't Commerce Nov. 25, 1998) (final rule). To determine whether entrustment or direction

exists, Commerce has examined:

> (1) whether the government has in place during the relevant period a governmental
> policy to support that respondent; and (2) whether the evidence on the record
> established a pattern of practices on the part of the government to act upon that
> policy to entrust or direct the associated private entity decisions.

IDM at 26. In making this determination, Commerce may consider circumstantial evidence, including "{p}roof of motive, propensity, proclivity, opportunity, and capacity." *Micron Tech., Inc. v. United States*, 31 CIT 2031, 2034-35, 535 F.Supp.2d 1336, 1340-41 (2007) (quoting *Hynix Semiconductor Inc. v. United States*, 29 CIT 995, 1008, 391 F.Supp.2d 1337, 1349 (2005)); IDM at 26 (citing Issues and Decision memorandum accompanying *Supercalendered Paper From Canada*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) at cmt. 11).

Substantial evidence demonstrates that Krakatau POSCO operated to achieve the policy goals of the GOI and at the direction of GOI-owned and controlled Krakatau Steel. Commerce, however, failed to adequately consider this information and fully explain its determination to the contrary. Instead, Commerce unreasonably relied on unsupported and contradictory claims from GOI officials as the basis for its decision – grounding its decision in evidentiary sources inadequate to support its conclusion. *See SKF USA*, 263 F.3d at 1378. As a result, Commerce's determination regarding entrustment and direction was unreasonable, unsupported by substantial evidence and otherwise unlawful.

### a.   The Government of Indonesia Directed Krakatau POSCO to Act for the Benefit of National Priorities for the Steel Industry

Defendant and Kenertec argue that Commerce correctly found that there was no link between the GOI's policies supporting its steel industry and Krakatau POSCO's participation in the Cilegon steel cluster. Further, both Defendant and Kenertec highlight Commerce's reliance on the GOI's verification responses to support their conclusion, despite clear deficiencies in those responses. When taken as a whole, the record demonstrates that the GOI directed Krakatau POSCO to operate according to GOI priorities, including providing products to downstream steel industries, including the wind tower industry, as Commerce preliminarily found.

Initially, the GOI reported that "{t}he {Cilegon steel cluster} project is included in the RIPIN as part of domestic steel industry's <u>contribution to support GOI master plan</u> to develop industry sector by 2035." GOI SQR at 21 (emphasis added). Krakatau POSCO's Annual Report [

]. GOI IQR at Exhibit GOI-CTL-13, pp. 49-50. According to Krakatau POSCO, [

]." *Id.* at 49. As a result, Krakatau POSCO stated that it would [

]. *Id.* This portion of the Annual report states in full:

[

].

*Id.* at 49-50.

Kenertec attempts to minimize Krakatau POSCO's statement as "expressing commercial self-interest" and claims that "{p}rivate companies routinely indicate support for government programs or policies." Kenertec Br. at 37. As an initial matter, it is not clear that "private" companies routinely cooperate with state-owned entities to support the competitiveness of <u>downstream</u> industries, pursuant to a specific government plan and based on a mutual understanding with that state-owned entity of the needs of the country overall. Private companies typically operate to increase profits, not to advance government policies. Moreover, this Kenertec's characterization of this statement overlooks the unique commercial reality of Krakatau POSCO. Krakatau POSCO is <u>not</u> a private company, as it is owned and controlled by government

entity Krakatau Steel.  And Krakatau POSCO [

] and its state-owned owners instituted.  In fact,

Krakatau POSCO's Annual Report [

].

Both Kenertec and the Defendant rely on the GOI's corrections and verification responses
to minimize the connection between Krakatau POSCO and the GOI's national policies.  Indeed,
Commerce's reversal on this key issue was based wholly on an alleged "minor correction"
submitted by the GOI at verification, with no other key record evidence having changed after the
preliminary determination.  Yet as a whole, the GOI's own reporting supported that Krakatau
POSCO was acting in concert with and in an effort to advance GOI policy, being entrusted and
directed to do so by public body Krakatau Steel and the GOI itself.  For example, Defendant cites
the GOI's minor questionnaire corrections to support Commerce's claim that Krakatau Steel did
not exert influence over Krakatau POSCO.  Def. Br. at 32-33.  However, Commerce's conclusions
based on these corrections were unreasonable and unlawful.  *See* IDM at 27.  In its minor
corrections to the first supplemental questionnaire response, the GOI denies that Krakatau Steel
and Krakatau POSCO's plan to build 10 million tons of crude steel capacity in Cilegon was a GOI
plan, but rather that it was a "long-term commercial goal set by Krakatau Steel and Krakatau
POSCO independently of the GOI."  GOI Minor Corrections at 1.  On its face, this claim is
contradictory.  The GOI controls the decision making of Krakatau Steel, and Commerce repeatedly
found that Krakatau Steel itself is a government authority.  IDM at 25.  *See also* WTTC Opening
Br. at 35-36.  Therefore, it is impossible that Krakatau Steel's joint plan with Krakatau POSCO
was "independent" of the GOI because Krakatau Steel is the GOI.  Commerce failed to fully
explain how Krakatau POSCO's joint plan with Krakatau Steel, which itself is undisputedly a

state-owned public body and government "authority," could serve as evidence that the plan was made independent of the government.

Likewise, it was unreasonable for Commerce to rely on the GOI's "correction" regarding Krakatau POSCO and Krakatau Steel's shared operations.  In its minor corrections, the GOI describes the intertwined relationship between Krakatau POSCO and Krakatau Steel.  Specifically, the GOI explains that the two companies, both of which have significant government ownership, "set their goal" for crude steel capacity.  GOI Minor Corrections at 1 (emphasis added).  The GOI implies that maintenance of this plan is ongoing because the crude steel capacity "remains the same today."  *Id.*  As WTTC explained in its brief, actions by Krakatau Steel in the Cilegon steel cluster are actions by the GOI.  *See* WTTC Opening Br. at 35.  Within the Cilegon steel cluster, Krakatau POSCO "depends on {government authority} Krakatau Steel for the production of its facilities and for the provision of water, electricity, and access to the port for raw materials," and Krakatau Steel has the right of first refusal on one million tons of Krakatau POSCO slab each year. IDM at 28-29.  That is, Krakatau POSCO has entered into an arrangement with a government body that controls whether it can keep the lights on or have access to inputs for production.  Like the Defendant, *see* Def. Br. at 38, Commerce only acknowledged this fact in passing without explaining why it should be disregarded and this failed to offer adequate explanation for its conclusion in light of the record evidence.  *See SKF USA*, 263 F.3d at 1382; *Motor Vehicle Mfrs.*, 463 U.S. at 43.  Commerce's refusal to address these facts, which detract from its overall conclusion, also renders its decision unreasonable.  *See CS Wind*, 832 F.3d at 1373.

> **b.    The Government of Indonesia's Revised Claims at Verification are an Unreasonable Basis for Commerce's Entrustment and Direction Determination**

Defendant and Kenertec argue that Commerce reasonably revised its understanding of record information based on statements the GOI provided at verification. *See* Def. Br. at 32-33; Kenertec Br. at 39-40. Indeed, Commerce's final determination on the issue of entrustment and direction hinged on selectively accepting a GOI official's contradictory remarks about the role the GOI plays in Krakatau POSCO's decision making – remarks that represented a complete departure from the GOI's prior position, after that position resulted in a finding of "entrustment or direction" that was not beneficial to the GOI. *See* IDM at 28. Record evidence in the underlying investigation included multiple public statements from high-ranking GOI officials to a major Indonesian newspaper about the heavy-handed influence the GOI had over Krakatau POSCO's decision making and production operations as part of the larger Indonesian economy. *See id.* In its final determination, Commerce ignored this evidence and instead relied on two short statements from a GOI official at verification: (1) that the GOI intervened to preserve Krakatau POSCO through "safeguards and antidumping duties to assist or protect the domestic steel producers," and (2) that the GOI encouraged integration in the steel supply chain by "tak{ing} steps to encourage linkages between domestic producers and consumers – for example in the form of hosting exhibitions." *See* GOI Verification Report at 9. These were not merely "clarifications," but rather outright contradictions of record evidence. Def. Br. 32.

Commerce unreasonably relied significantly on the GOI official's statement at verification, despite this statement's plain inconsistency with other record evidence. First, in response to Commerce's question about measures the GOI took to integrate the steel industry, the GOI official only mentioned that the GOI "hosted exhibitions." *See* GOI Verification Report at 9. This minor

activity is markedly different than the drastic intervention the Indonesian Industry Minister announced, to the point of implausibility. The Industry Minister's public statements explained that the GOI planned to "integrat{e} the steel supply chain between local steel makers and domestic buyers," which involved "direct{ing}" Krakatau Steel and Krakatau Steel and Krakatau POSCO to "supply local industries." WTTC Benchmark Submission at Exhibit 7. According to the Indonesian Industry Minister, this scheme would "place Krakatau POSCO in the upstream steel industry, working on blast furnace as well as plate, hot-rolled and cold-rolled mills." *Id.* These public statements indicate that the GOI's involvement in Krakatau POSCO's plate operations and provision to downstream companies was much more extensive and systemic than what the GOI officials reported (*i.e.*, "encourag{ing} linkages" through exhibitions). *See* GOI Verification Report at 9.

Likewise, Commerce also unreasonably relied on the GOI official's claims at verification regarding intervention to preserve Krakatau POSCO. In its preliminary determination, Commerce found entrustment and direction partially based on public statements from the Indonesian Industry Minister in 2017 that "the Indonesian government planned to intervene by integrating the steel supply chain between local steel makers and domestic buyers." *See* PDM at 11. There was no mention that safeguards or trade remedies were part of this plan to save Krakatau POSCO; to the contrary, the statement referred specifically to integration of the supply chain between steelmakers and steel buyers (*e.g.*, the wind tower industry). Indeed, the trade remedies and safeguards began in 2010, which substantially predate the Industry Minister's statements in 2017, President Jokowi's directive to intervene with Krakatau POSCO in 2015, and the RIPIN's policy to grow the steel industry. Krakatau POSCO's Annual Report appear to confirm that it implemented the President of Indonesia's directive to intervene and the Ministry of Industry's plan to integrate the steel

industry.  *See* GOI IQR at Exhibit GOI-CTL-13, pp. 49-50 [



].

Further, Commerce relied heavily on these two, isolated justifications despite a lack of
supporting documentation at verification.  As previously noted, Commerce asked that the GOI
explain how it developed its master plan and to provide "supporting studies, official memorandum,
underlying reports, detailed quotas, etc."  GOI Verification Report at 8.  The GOI did not provide
this information.  Commerce also requested the GOI provide its involvement in the Cilegon steel
cluster project involving Krakatau Steel and Krakatau POSCO, yet the GOI also "did not provide
documentation to substantiate {its} statements . . . ."  GOI Verification Report at 8-9.  *See also*
WTTC Opening Br. at 35.

Commerce accepted "clarification" of record information on Krakatau Steel and Krakatau
POSCO without conducting verification on these companies.  Due to the COVID-19 pandemic,
Commerce could not complete "the entirety of the CVD verification agenda for Krakatau Steel
and Krakatau POSCO."  *See* Memorandum from Benjamin Luberda, through Melissa G. Skinner
and Andrew Medley, to The File, re: *Antidumping and Countervailing Duty Investigations of
Utility Scale Wind Towers from Indonesia: Early Conclusion of Verifications* (Mar. 27, 2020) at
1-2, P.R. 235.  Therefore, Commerce's reversal was based entirely on the GOI's incomplete and
unsubstantiated verification responses.

2.     **Commerce Unlawfully Deviated from its Preliminary Determination
Without Adequate Justification and Based on the Same Evidence**

As explained in WTTC's brief, Commerce's decision to reverse its decision based on the
same evidence as the preliminary determination was not reasonable.  In *Nexteel*, this Court
instructed the Commerce to undo its finding of a particular market situation after Commerce

reversed its preliminary determination based on an unreasonable reframing of the same evidence. 355. F.Supp.3d at 1351 ("The court finds it unreasonable that Commerce reversed its position and subsequently found a particular market situation based on the same evidence. It does not stand to reason that individually, the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion").

Contrary to Defendant's claim, WTTC does not claim that it is "*per se* unreasonable for Commerce to change course" based on the same evidence. Instead, WTTC posits that the circumstances surrounding Commerce's reframing of existing evidence were unreasonable, as the Court found in *Nexteel*. Commerce had the opportunity to request additional information to corroborate the GOI's statements and minor corrections. In fact, Commerce did attempt to get additional information, but it was not provided. *See* GOI Verification QR at 9. Indeed, Commerce would not have asked for this information if it was irrelevant to better understanding the GOI's influence over Krakatau POSCO. When the GOI did not provide this information, Commerce claimed that these omissions were irrelevant because the necessary information was already on the record (*i.e.*, Commerce already had this information when it made its preliminary determination). IDM at 34; *see also* Def. Br. at 37. It is plainly unreasonable for a decision maker to come to one conclusion, claim it needs additional information, not receive that information, and then reverse its original conclusion based on information it already had. Therefore, as in *Nexteel*, Commerce's actions in ultimately relying on the same evidence to come to the opposite conclusion were unreasonable.

Finally, Defendant and Kenertec both claim that, regardless of the Court's ruling in *Nexteel*, Commerce may change its determination without new evidence, so long as its decision is supported by substantial evidence and in accordance with law. *See* Def. Br. at 35; Kenertec Br. 41.

As discussed above, however, Commerce's reversal was not reasonable.  Commerce based its preliminary determination on record evidence that showcased the GOI's intervention in Krakatau POSCO's decision making, including evidence that the GOI directed Krakatau POSCO to produce products for use in downstream industries to support the GOI's national priorities.  Based largely on unverified and contradictory claims regarding the same information at verification, Commerce abandoned its original position.  Such a reversal is not reasonable or in accordance with law.

## III.    **CONCLUSION**

For the reasons detailed above, WTTC respectfully submits that this Court should remand the final results of Commerce's countervailing duty investigation into wind towers from Indonesia for further consideration of its finding that Krakatau POSCO is not an authority and that it was not entrusted or directed to provide CTL Plate for LTAR.

Respectfully submitted,

*/s/ Alan H. Price*
Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: August 6, 2021

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Wind Tower Trade Coalition's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,986 words.

<u>*/s/ Alan H. Price*</u>
(Signature of Attorney)

<u>Alan H. Price</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>August 6, 2021</u>
(Date)