C-560-834
Remand
Consol. Ct. No. 20-03687
POI: 01/01/2018 – 12/31/2018
**Public Document**
E&C/OII:  AWW/MK

*PT. Kenertec Power System & Wind Tower Trade Coalition v. United States*,
**Consol. Ct. No. 20-03687 (CIT July 20, 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.     SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination (Final Redetermination) pursuant to the remand order of the U.S. Court of

International Trade (the Court) in *PT. Kenertec Power System & Wind Tower Trade Coalition v.

United States*, Consol. Ct. No. 20-03687 (CIT July 20, 2021) (*Remand Order*).  This Final

Redetermination concerns Commerce's final determination in the countervailing duty

investigation of utility scale wind towers (wind towers) from Indonesia.[1]

In its *Remand Order*, the Court remanded the *Final Determination* to Commerce to

determine whether the Rediscount Loan Program included in Commerce's upstream subsidy

calculation for PT. Kenertec Power System (Kenertec), the sole mandatory respondent in the

investigation, is an export subsidy and should be excluded from the calculation.[2]  Pursuant to the

*Remand Order*, Commerce has determined that the Rediscount Loan Program is export

contingent and revised Kenertec's upstream subsidy calculation to remove this program.

Therefore, for this Final Redetermination, Commerce finds that Kenertec's net countervailable

---

[1] *See Utility Scale Wind Towers from Indonesia:  Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 85 FR 40241 (July 6, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam:  Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Orders*, 85 FR 52543 (August 26, 2020).

[2] *See Remand Order* at 1.

subsidy rate is *de minimis*, and we reach a negative countervailing duty determination.  In addition, Commerce has addressed the Wind Tower Trade Coalition (petitioner) and Kenertec's comments regarding Commerce's draft results of redetermination (Draft Redetermination).[3]

Accordingly, if the Court sustains the Final Redetermination, we will issue an amended final negative countervailing duty determination, revoke the countervailing duty order on wind towers from Indonesia, and instruct U.S. Customs and Border Protection to terminate the suspension of liquidation and to liquidate entries of wind towers from Indonesia without regard to countervailing duties.[4]

## II.    BACKGROUND

On July 29, 2019, Commerce initiated a countervailing duty investigation on wind towers from Indonesia.[5]  On December 13, 2019, we published the affirmative preliminary determination and preliminarily determined that Kenertec received countervailable subsidies at a net countervailable subsidy rate of 20.29 percent, which was assigned as the all-others rate applicable to all producers and/or exporters not individually examined.[6]  After the publication of the *Preliminary Determination*, the petitioner submitted an allegation that Kenertec received a competitive benefit from upstream subsidies to producers of cut-to-length steel plate (CTL

---

[3] *See* Memorandum, "Draft Results of Redetermination Pursuant to Court Remand, *PT. Kenertec Power System & Wind Tower Trade Coalition v. United States*, Consol. Ct. No. 20-03687 (CIT July 20, 2021)," dated August 3, 2021.

[4] Because liquidation of entries produced and/or exported by Kenertec is enjoined during the pendency of the litigation, including all appeals, we will issue instructions to terminate the suspension of liquidation and to liquidate without regard to countervailing duties if the time to file an appeal expires and there is no appeal, or, if appealed, the amended final negative countervailing duty determination is affirmed in a final and conclusive court decision.  For additional details, *see* Comment 2 in response to Kenertec's comments requesting clarification regarding the suspension of liquidation and cash deposit requirements that would apply if the Court affirms the Final Redetermination.

[5] *See Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam:  Initiation of Countervailing Duty Investigations*, 84 FR 38216 (August 6, 2019).

[6] *See Utility Scale Wind Towers from Indonesia:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 FR 68109 (December 13, 2019) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum.

plate).[7]  Kenertec filed rebuttal factual information and comments in response to the allegation.[8]

On March 12, 2020, Commerce determined that the petitioner's allegation met the elements

required for initiating an upstream subsidy investigation, but that the upstream subsidy

investigation would be deferred until any first administrative review, pursuant to section

703(g)(2)(B)(i) of the Tariff Act of 1930, as amended (the Act).[9]

In the *Final Determination*, Commerce determined that further analysis of the upstream

subsidy allegation was warranted because the petitioner met the requirements for initiating an

upstream subsidy investigation, and there is no language in the Act stating that any initial

deferment of an upstream subsidy investigation to an eventual first administrative review would

preclude Commerce from ultimately fully investigating an upstream subsidy allegation pursuant

to section 703(g)(2)(B)(ii) of the Act.[10]  However, because necessary information to determine

the existence and extent of countervailable upstream subsidies provided to producers of CTL

plate was not available on the record, and because certain information could not be verified,

Commerce relied on facts otherwise available, pursuant to section 776(a)(1) and (a)(2)(D) of the

Act, to make a final determination regarding the existence and extent of upstream

subsidization.[11]

After examining the information on the record, *i.e.*, the previous subsidy findings made

with respect to CTL plate from Indonesia,[12] Commerce determined that upstream producers of

---

[7] *See* Petitioner's Letter, "Upstream Subsidy Allegation," dated February 3, 2020.
[8] *See* Kenertec's Letter, "Kenertec's Rebuttal Comments and Factual Information in Response to Petitioner's Upstream Subsidy Allegation," dated February 12, 2020.
[9] *See* Memorandum, "Upstream Subsidy Allegation," dated March 12, 2020 at 9 (Upstream Subsidy Memorandum).
[10] *See Final Determination* IDM at 57-58.
[11] *Id.* at 59.
[12] *See Final Affirmative Countervailing Duty Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 FR 73155 (December 29, 1999) (*CTL Plate from Indonesia*); *see also Certain Cut-To-Length Carbon-Quality Steel Plate from India, Indonesia, and the Republic of Korea; Continuation of Antidumping and Countervailing Duty Orders*, 83 FR 10672 (March 12, 2018) (*Continuation of CTL Plate Orders*).

CTL plate in Indonesia benefitted from countervailable subsidies during the period of investigation, based on its determination in *CTL Plate from Indonesia*.[13]  Further, Commerce found that a comparison of Kenertec's purchases of CTL plate from PT. Krakatau POSCO (Krakatau POSCO) to its imports of CTL plate on a monthly basis demonstrated that Kenertec received a competitive benefit and that the upstream subsidies had a significant effect on the cost of manufacturing of producing wind towers.[14]  Commerce then determined that, of the countervailable subsidies investigated in *CTL Plate from Indonesia*, only the Two-step Loan Program and the Rediscount Loan Program were applicable to Krakatau POSCO.  Therefore, because under section 771A(c) of the Act the countervailing duty imposed may not be greater than the amount of the countervailable subsidy determined with respect to the upstream product, Commerce determined that the countervailable upstream subsidy rate for Kenertec's purchases of CTL plate was 5.70 percent.[15]

Kenertec challenged the *Final Determination* before the Court and the determination that Kenertec received countervailable upstream subsidies at a rate of 5.70 percent through its purchases of CTL plate, arguing, *inter alia*, that the Rediscount Loan Program was previously found to be an export subsidy and its inclusion in the upstream subsidy calculation was erroneous.[16]  On July 9, 2021, the Government requested a partial voluntary remand for Commerce to reconsider or further explain the upstream subsidy determination and, if appropriate, recalculate the countervailing duty rates for Kenertec and all other producers and exporters not individually examined in the investigation.[17]  In response, Kenertec argued that the

---

[13] *See Final Determination* IDM at 59-60 (citing *CTL Plate from Indonesia*, 64 FR at 73163).
[14] *Id*. at 61.
[15] *Id*. at 62-63.
[16] *See* "Memorandum in Support of PT. Kenertec Power System's Motion for Judgment Upon the Agency Record," Consol. Ct. No. 20-03687, CM/ECF Doc. Nos. 25-1 (Confidential) and 26-1 (Public), filed April 7, 2021.
[17] *See* "Defendant's Motion for Partial Voluntary Remand," Consol. Ct. No. 20-03687, CM/ECF Doc. No. 35, filed July 9, 2021.

Court should not grant the Government's request or, in the alternative, the Court should only grant a remand limited to removal of the Rediscount Loan Program from the upstream subsidy calculations.[18]  In its *Remand Order*, the Court granted the Government's request for a partial voluntary remand for Commerce to determine whether the Rediscount Loan Program is an export subsidy and, if so, exclude it from the upstream subsidy calculation.[19]

On August 3, 2021, we released the Draft Redetermination, where we determined that the Rediscount Loan Program is an export subsidy and should be excluded from the upstream subsidy calculation.  On August 9, 2021, the petitioner and Kenertec submitted comments on the Draft Redetermination.[20]  Kenertec agrees with our Draft Redetermination, while the petitioner argues that we should continue to include the Rediscount Loan Program in the upstream subsidy calculation, use another rate in the calculation, or reopen the record to collect more information on various programs.

## III.  DISCUSSION

### A.  Legal Framework

Section 771A of the Act specifically defines an "upstream subsidy" as follows:

(a) Definition.—The term "upstream subsidy" means any countervailable subsidy, other than an export subsidy that—

> (1) is paid or bestowed by an authority (as defined in section 771(5)) with respect to a product (hereinafter in this section referred to as an "input product") that is used in the same country as the authority in the manufacture or production of merchandise which is the subject of a countervailing duty proceeding;

---

[18] *See* "Response of Plaintiff PT. Kenertec Power System to Defendant's Motion for Voluntary Remand," dated April 7, 2021.
[19] *See Remand Order* at 1 ("{A} simple decision on whether the subsidy at issue is an export subsidy, which may not be included in upstream subsidy calculation, would appear to be easily determined.")
[20] *See* Petitioner's Letter, "Comments on Draft Remand Determination," dated August 9, 2021 (Petitioner Comments); and Kenertec's Letter, "Comments on Draft Remand Redetermination," dated August 9, 2021 (Kenertec Comments).

(2) in the judgment of the administering authority bestows a competitive benefit on the merchandise; and

(3) has a significant effect on the cost of manufacturing or producing the merchandise.

Each of the three elements listed above must be satisfied in order for Commerce to determine the existence of an upstream subsidy.  If all three elements are satisfied, then section 771A(c) of the Act states that the countervailing duty imposed is the amount equal to the competitive benefit, except that the amount of duty imposed may not be greater than the amount of the countervailable subsidy determined with respect to the upstream product.

**B.  Analysis**

In this Final Redetermination, we are complying with the Court's *Remand Order* to determine whether the Rediscount Loan Program is an export subsidy and, if so, to remove it from our upstream subsidy rate calculation.  As a result of our analysis on remand, as explained below, we find that the Rediscount Loan Program is export contingent and should not be included in the calculation of the upstream subsidy.  Accordingly, we find that Kenertec's revised countervailing duty rate is *de minimis*, and, thus, we reach a negative countervailing duty determination.

As explained in the *Final Determination*, to make a final determination regarding the existence and extent of upstream subsidization, Commerce relied on facts otherwise available, pursuant to section 776(a)(1) and (a)(2)(D) of the Act, because necessary information to determine the existence and extent of countervailable upstream subsidies provided to producers of CTL plate was not available on the record and certain information could not be verified.[21] Commerce determined that each of the elements in section 771A of the Act were satisfied,

---

[21] *See Final Determination* IDM at 59.

namely that there is a countervailable subsidy other than an export subsidy that is paid or bestowed by an authority with respect to CTL plate used in Indonesia, bestows a competitive benefit, and has a significant effect on the cost of manufacturing or producing wind towers.[22]  In making this determination, Commerce relied upon information the petitioner provided in its upstream subsidy allegation, including information from *CTL Plate from Indonesia* and *Continuation of the CTL Plate Orders*,[23] as facts otherwise available to find that CTL plate producers in Indonesia, including Krakatau POSCO, benefitted from countervailing subsidies during the period of investigation.  We explained that the subsidy programs found to be countervailable in *CTL Plate from Indonesia* include programs that were specific to a CTL plate producer that did not supply Kenertec,[24] and that only the Two-Step Loan Program, with a countervailing duty rate of 0.65 percent, and the Rediscount Loan Program, with a countervailing duty rate of 5.05 percent, were subsidy programs that were available to CTL plate producers during the period of investigation.  Therefore, we found that the amount of the countervailable subsidy determined with respect to the upstream product was 5.70 percent, *i.e.*, the combined rates for the two loan programs available to CTL plate producers.  The 5.70 percent countervailable subsidy determined with respect to CTL plate was included in Kenertec's net countervailable subsidy rate of 5.90 percent, in accordance with section 771A(c) of the Act.

---

[22] *Id*. at 60-63; *see also* Memorandum, "Final Determination Calculation Memorandum for Kenertec," dated June 29, 2020; and Memorandum, "Additional Analysis Regarding the Final Determination," dated June 29, 2020.

[23] *See Countervailing Duties*, 63 FR 65348, 65392 (November 25, 1998) (*CVD Preamble*) (stating that Commerce would rely primarily on its previous subsidy findings in its upstream subsidy analysis).

[24] These programs are:  (1) the 1995 Equity Infusion into Krakatau Steel; (2) the Pre-1993 Equity Infusions to Krakatau Steel; (3) the 1989 Equity Infusion to the CRMI; and (4) the Three-Step Equity Infusion to CRMI. *See CTL Plate from Indonesia*, 64 FR at 73159-61; *see also Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia*, 64 FR 40457, 40462 (July 26, 1999) ("The equity conversion is specific within the meaning of section 771(5A)(D) of the Act because it was limited to Krakatau {Steel}.")

Pursuant to the *Remand Order*, we determine that the 5.70 percent upstream subsidy rate included in Kenertec's net countervailable subsidy rate included an export subsidy.  In the *Final Determination*, we relied on our previous subsidy findings in *CTL Plate from Indonesia* as facts otherwise available, pursuant to section 776(a)(1) and (a)(2)(D) of the Act, to determine the existence and extent of upstream subsidization of CTL plate producers.  The Rediscount Loan Program was found to be contingent upon export performance in two prior countervailing duty proceedings involving Indonesia, including *CTL Plate from Indonesia*.[25]  Nothing on our record indicates that we should change that finding here.  Section 771A(a) of the Act defines an upstream subsidy as any countervailable subsidy other than an export subsidy.  Because the Rediscount Loan Program is an export subsidy, and thus by statutory definition cannot constitute an upstream subsidy, we are removing the Rediscount Loan Program and its accompanying rate from our calculation of the countervailable subsidy determined with respect to the upstream input of CTL plate.  After making this change, the amount of the countervailable subsidy determined with respect to the upstream input based on the rate of the Two-Step Loan Program is 0.65 percent.  Thus, pursuant to section 771A(c) of the Act, the upstream subsidies provided to Krakatau POSCO that passed through to Kenertec in its purchases of CTL plate are countervailable at a rate of 0.65 percent.  Moreover, the net countervailable subsidy rate for Kenertec is now 0.85 percent, which is less than one percent and shall be disregarded as it is *de minimis*.[26]

---

[25] *See CTL Plate from Indonesia*, 64 FR at 73162; *Preliminary Negative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination:  Extruded Rubber Thread from Indonesia*, 63 FR 48191, 48192 (September 9, 1998), unchanged in *Final Negative Countervailing Duty Determination:  Extruded Rubber Treaded from Indonesia*, 64 FR 14695 (March 26, 1999) (*Extruded Rubber Thread from Indonesia*).
[26] *See* section 705(a)(3) of the Act; *see also* section 703(b)(4)(A) of the Act.

## IV.    KENERTEC'S COMMENTS ON DRAFT RESULTS OF REDETERMINATION

**Comment 1:   Whether Commerce Should Affirm its Conclusion in the Draft Redetermination That the Rediscount Loan Program is an Export Subsidy**

Kenertec argues that Commerce correctly determined in the Draft Redetermination that the Rediscount Loan Program is an export subsidy and should be removed from the upstream subsidy calculation.[27]  Kenertec also argues that Commerce continues to improperly apply adverse facts available to the Two-Step Loan Program and apply the calculation of Kenertec's *ad valorem* subsidy rate for wind towers to the downstream product (*i.e.*, wind towers) without further adjustments, as required by the Act.[28]  However, Kenertec recognizes the *Remand Order* is limited to a determination as to whether Commerce included an export subsidy in its upstream subsidy calculation.  Therefore, while Kenertec disagrees with certain aspects of the upstream calculation that do not pertain to the *Remand Order*, Kenertec agrees that Commerce's Draft Redetermination complies with the *Remand Order*.

**Commerce's Position:**

We agree with Kenertec that the *Remand Order* is limited to determining whether the Rediscount Loan Program is an export subsidy, and that our Final Redetermination complies with the *Remand Order*.  Therefore, we have not addressed the arguments Kenertec has raised with respect to other aspects of the upstream subsidy calculation that are not within the scope of this remand.

**Comment 2:   Whether Commerce Should Clarify the Suspension of Liquidation and Cash Deposit Requirements That Would Apply to Kenertec's Entries if the Final Redetermination is Upheld**

Kenertec argues that if the Court upholds Commerce's Final Redetermination, Commerce should clarify that even if Kenertec's entries remain suspended through the appeal period, at both

---

[27] *See* Kenertec Comments at 2.
[28] *Id.* at 4.

the Court and the Court of Appeals for the Federal Circuit, Commerce will refund all cash deposits paid while the entries of wind towers remain suspended and will not require any cash deposits to be paid during the pendency of any appeals.

**Commerce's Position:**

We affirm that, pursuant to *Timken*,[29] as clarified by *Diamond Sawblades*,[30] if the Court upholds this Final Redetermination, Commerce will publish a notice of a court decision that is not "in harmony" with a determination and must suspend liquidation of entries pending a "conclusive" court decision.  If the Court sustains this Final Redetermination, we will instruct CBP to continue the suspension of liquidation of entries produced and/or exported by Kenertec at a cash deposit rate of 0.00 percent until otherwise instructed and authorize CBP to refund cash deposits paid as estimated countervailing duties for entries produced and/or exported by Kenertec that remain suspended and were made on or after the date of publication of the affirmative preliminary determination (*i.e.*, December 13, 2019).  Additionally, Commerce will revoke the countervailing duty order on wind towers from Indonesia, will not initiate any new administrative reviews of the countervailing duty order, and will discontinue any ongoing administrative review of the countervailing duty order.  If the Court's ruling sustaining this Final Redetermination becomes final and conclusive, Commerce will instruct CBP to terminate the suspension of liquidation and to liquidate entries produced and/or exported by Kenertec without regard to countervailing duties.

---

[29] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).
[30] *See Diamond Sawblades Mfrs. Coalition v. United States*, 626 F.3d 1374 (Fed. Cir. 2010) (*Diamond Sawblades*).

## V.       PETITIONER'S COMMENTS ON DRAFT RESULTS OF REDETERMINATION

**Comment 1:  Whether the Comment Period on the Draft Redetermination was Adequate**

The petitioner argues that parties were not provided with adequate time to prepare comments concerning the Draft Redetermination, especially since Commerce's departure from the *Final Determination* would result in revoking the order on wind towers from Indonesia.  The petitioner argues that Commerce denied its request for a one-week extension to comment on the Draft Redetermination, and thus, left the petitioner only four business days to respond to a significantly different outcome from the *Final Determination*.[31]  The petitioner recognizes that Commerce's decision to deny the extension request was due to the Court's *Remand Order* stating that this redetermination was a "simple decision" that would be "easily determined."[32]  However, the petitioner disagrees that the decision to reexamine the upstream subsidy calculation is "simple" and states that all interested parties would have benefitted from additional time for Commerce to collect and consider comments on the upstream subsidy calculation.

**Commerce's Position:**

We agree that additional time would have benefitted all parties.  Nevertheless, the Court provided 30 days for Commerce to release a draft redetermination, solicit and address comments, and address the comments in a final redetermination.  We issued the Draft Redetermination on August 3, 2021, and we set aside six of the 30 days provided for this remand to allow interested parties to comment on the Draft Redetermination.  Furthermore, the only issue that the Court remanded to Commerce is whether the Rediscount Loan Program is an export subsidy.  As explained in our analysis, the only information available on the record that provides an explanation of the Rediscount Loan Program is the final determination in *CTL Plate from*

---

[31] *See* Petitioner Comments at 2.
[32] *See Remand Order* at 1.

*Indonesia*, which states, "because the program is contingent upon export performance, it is an export subsidy under section 771(5A)(B) and is, therefore, specific."[33]  Therefore, given the allotted time and the limited scope of the remand, interested parties were provided with adequate time to comment on the changes made to our final determination in the Draft Redetermination.

**Comment 2:   Whether Commerce Should Retain the Rediscount Loan Program Rate in the Upstream Subsidy Calculation**

The petitioner argues that Commerce improperly removed the Rediscount Loan program from its upstream subsidy calculation.  Further, the petitioner argues that Commerce does not cite to record evidence to support its finding that the Rediscount Loan program is export contingent and instead relies on findings in previous investigations.[34]  The petitioner asserts that there are two steps to an upstream subsidy finding:  first, Commerce must find that the three statutory elements are satisfied regarding the provision of a countervailable subsidy, other than an export subsidy, and, second, Commerce must calculate and include the amount of the competitive benefit conferred by the upstream subsidy in the countervailing duty rate.[35]  Record evidence supports Commerce's finding that the Government of Indonesia (GOI) provided countervailable subsidies, other than export subsidies, to producers of CTL plate, thus satisfying the first step of the analysis.[36]  The petitioner argues that, regardless of whether the Rediscount Loan Program is export contingent, Commerce can rely on the rate calculated for that program as facts available in order to calculate the amount of the upstream subsidy conferred to Kenertec. Using the rate from the Rediscount Loan Program as a "stand in" for the non-export subsidies

---

[33] *See CTL Plate from Indonesia*, 64 FR at 73162.
[34] *See* Petitioner Comments at 3.
[35] *Id.* at 4 (citing section 771A of the Act).
[36] *Id.* at 4-5.

that Commerce could not verify during the investigation is consistent with the statute and its definition of an upstream subsidy.[37]

**Commerce's Position:**

We disagree with the petitioner that Commerce improperly determined that the Rediscount Loan Program is an export subsidy because Commerce did not rely on record evidence. Pursuant to section 776(a)(1) and (a)(2)(D) of the Act, Commerce may make a determination on the basis of other facts available if "necessary information is not available on the record" or an interested party or other person "provides such information but the information cannot be verified as provided in section 782(i)" of the Act. Information regarding the subsidies that Krakatau POSCO received during the period of investigation is not on the record.[38] However, Commerce has stated that, for purposes of the upstream subsidy analysis, it would rely primarily on its previous subsidy findings.[39] Commerce previously determined in *Extruded Rubber Thread from Indonesia* and *CTL Plate from Indonesia* that the Rediscount Loan Program is specific because it is contingent upon export performance.[40] Commerce has not revisited the countervailability of the Rediscount Loan Program in a subsequent segment of a countervailing duty proceeding involving Indonesia, nor is there any information on the record of this investigation that suggests we should re-examine the Rediscount Loan Program. We also note that the petitioner provides no support for its contention that Commerce lacks the authority to rely on facts otherwise available where such reliance "has the effect of taking an affirmative determination to an overall negative determination in the entire investigation."[41] Therefore,

---

[37] *Id.* at 5.
[38] *See Final Determination* IDM at 59-60.
[39] *See CVD Preamble*, 63 FR at 65392; *see also Final Determination* IDM at 60.
[40] *See Extruded Rubber Thread from Indonesia*, 63 FR at 48192; and *CTL Plate from Indonesia*, 64 FR at 73162.
[41] *See* Petitioner Comments at 3.

Commerce's finding that the Rediscount Loan Program in this investigation is an export subsidy is properly based on facts otherwise available.

Second, we disagree with the petitioner that Commerce should retain the rate for the Rediscount Loan Program in the calculation of the upstream subsidy rate. The Act is clear that export subsidies cannot be considered upstream subsidies. As stated in the "Legal Framework" section above, section 771A(a) of the Act states that the term "upstream subsidy" means any countervailable subsidy, other than an export subsidy. Because Commerce determined that the Rediscount Loan Program is contingent upon export performance, the program, by statutory definition, is not an upstream subsidy under section 771A(a) of the Act.

We further disagree that Commerce can rely upon an export subsidy as facts available to calculate the extent of upstream subsidies allegedly provided. The facts available indicate that the Rediscount Loan Program is an export subsidy, and section 771A(c) of the Act expressly excludes export subsidies from the calculation of an upstream subsidy. It follows that the same prohibition would apply to the rate of an export subsidy, that such rate is excluded from the calculation of an alleged upstream subsidy. The petitioner cites to no authority that would allow Commerce to disregard the plain language of the Act and rely on an export subsidy as facts available to calculate an upstream subsidy rate. Because the Rediscount Loan Program is an export subsidy, neither the program nor the rate of subsidization calculated for that program can be determined to be an upstream subsidy, nor can either be used as facts available for an upstream subsidy. Thus, Commerce is excluding it from Kenertec's upstream subsidy rate calculation.

**Comment 3:   Whether Commerce Should Rely on a Different Upstream Subsidy Rate**

The petitioner argues that, if Commerce does not rely on the rate for the Rediscount Loan Program, Commerce should select an alternative rate as facts otherwise available to apply to Kenertec's upstream subsidy calculation.  According to the petitioner, there is substantial evidence on the record that Kenertec benefitted from upstream subsidies and, because Commerce has not conducted a full upstream subsidy investigation, reversing course and issuing a negative determination would be unduly prejudicial to the petitioner.[42]  Further, in the *Final Determination*, Commerce relied on *CTL Plate from Indonesia* and *Continuation of the CTL Plate Orders* as facts otherwise available to find that CTL plate producers in Indonesia benefitted from countervailable subsidies during the period of investigation.[43]  However, Commerce did not rely on the entire all-others rate calculated in *CTL Plate from Indonesia* in the upstream subsidy calculation.  The petitioner argues that Commerce should use the all-others rate from *CTL Plate from Indonesia* in its entirety, consistent with 703(c)(5) of the Act and the *AD/CVD Preamble*,[44] because Commerce routinely applies countervailing duty rates to companies based on the determination regarding the mandatory respondents without finding that each producer benefitted from each subsidy program.[45]  Therefore, because Krakatau POSCO is subject to the all-others rate in *CTL Plate from Indonesia*, Commerce should apply the full 15.90 percent rate to the upstream subsidy calculation rather than arbitrarily determine which subsidies received by the mandatory respondent in *CTL Plate from Indonesia*, Krakatau Steel, would have been applicable to Krakatau POSCO.[46]

---

[42] *See* Petitioner Comments at 6.
[43] *See Final Determination* IDM at 59-60; *see also Continuation of CTL Plate Orders*, 83 FR at 10673.
[44] *See Antidumping Duties; Countervailing Duties:  Final Rule*, 62 FR 27296, 27303 (May 19, 1997) (*AD/CVD Preamble*).
[45] *See* Petitioner Comments at 7.
[46] *Id*. at 8.

The petitioner also argues that Commerce's determination that certain subsidy programs in *CTL Plate from Indonesia* were not applicable to Krakatau POSCO is not supported by information on the record.  In the *Final Determination*, Commerce found that Krakatau Steel is an authority pursuant to section 771(5)(B) of the Act[47] and that there were numerous factors that enabled Krakatau POSCO to benefit from Krakatau Steel's investments, including the provision of land, water, electricity, and access to a port for raw materials.[48]  However, Commerce did not include these findings in the *Final Determination*, even though record evidence demonstrates that Krakatau POSCO benefitted from numerous subsidies.[49]  Commerce could reasonably apply certain of these subsidies to Krakatau POSCO on a facts available basis, reopen the record to gather more information, or defer the calculation of certain rates until the first administrative review, if the final determination remains affirmative.

**Commerce's Position:**

As an initial matter, we take note of the apparent conflict introduced in the petitioner's comments.  The petitioner states that Commerce "reasonably decided to base its calculation on facts otherwise available,"[50] but, in the same submission, it argues that Commerce should reopen the record and further investigate the existence and extent of upstream subsidies to avoid unfairness to the petitioner.[51]  In other words, the petitioner appears to claim that Commerce may only rely on facts otherwise available in accordance with section 776(a) of the Act if there is an affirmative upstream subsidy finding.  The petitioner provides no support for its position, and

---

[47] *See Final Determination* IDM at 25.
[48] *See* Memorandum, "Upstream Subsidy Allegation," dated March 12, 2020 (Upstream Subsidy Memo) at 4-5.
[49] *Id.* at 6.  Specifically, the petitioner notes that Commerce identified the following subsidy programs applicable to Krakatau POSCO:  Equity Infusion for Krakatau POSCO, Electricity for less than adequate remuneration (LTAR), Land for LTAR, Inputs for LTAR (*i.e.*, coking coal and iron ore), and Slab for more than adequate remuneration (MTAR).
[50] *See* Petitioner Comments at 5.
[51] *Id.* at 11.

section 776(a) of the Act includes no such limitation on Commerce's authority to rely on facts otherwise available.

In the *Final Determination*, we stated that Krakatau POSCO "is subject to the 'all others' rate in the *CTL Plate from Indonesia* order because it is a producer of CTL plate in Indonesia."[52] However, we disagree with the petitioner that under these circumstances it would be reasonable to rely on the 15.90 percent all-others rate in *CTL Plate from Indonesia* as facts otherwise available to calculate Kenertec's upstream subsidy rate.  Commerce countervailed six subsidy programs in *CTL Plate from Indonesia*, including the Rediscount Loan Program.[53]  Because the rates determined for the three mandatory respondents (including Krakatau Steel) in *CTL Plate from Indonesia* were either zero or based entirely on facts otherwise available, Commerce used a simple average of the three rates to determine the all-others rate.[54]  Thus, the all-others rate inherently includes an export subsidy (*i.e.*, the Rediscount Loan Program) and relying on the all-others rate in *CTL Plate from Indonesia* as facts otherwise available to calculate Kenertec's upstream subsidy rate would impose a duty based, in part, on a subsidy program that is excluded from being defined as an upstream subsidy by law.[55]

Moreover, the Act prescribes a method to determine an all-others rate when Commerce limits its individual examination to a reasonable number of exporters or producers for the limited purpose of assigning a rate to the non-individually investigated companies in a countervailing duty investigation.[56]  We do not consider it appropriate to apply the all-others rate from *CTL*

---

[52] *See Final Determination* IDM at 60-61.
[53] *See CTL Plate from Indonesia*, 64 FR at 73159-62.
[54] *Id.* at 73163.
[55] The all-others rate also includes equity infusion programs that were specific to Krakatau Steel and not available to other CTL plate producers in Indonesia, such as Krakatau POSCO. *See Final Determination* IDM at 62.
[56] *See* section 705(c)(5)(A) of the Act; *see also Changzhou Hawd Flooring Co., Ltd. v. United States*, 947 F.3d 781, 791 (Fed. Cir. 2020) (citing *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017), and *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016)).

*Plate from Indonesia* in this context because, as stated above, it includes an export subsidy. Using the all-others rate for purposes of calculating Kenertec's upstream subsidy rate would be tantamount to treating an export subsidy as an upstream subsidy.  Therefore, we have not relied on the all-others rate in *CTL Plate from Indonesia* as facts otherwise available to calculate Kenertec's upstream subsidy rate.

We also disagree with the petitioner's argument that our determination to not apply certain subsidy programs from *CTL Plate from Indonesia* to Krakatau POSCO is not supported by record evidence.  According to the petitioner, our findings that Krakatau Steel is an authority within the meaning of section 771(5)(B) of the Act and that forty percent of the funds raised in Krakatau Steel's initial public offering went into the creation of Krakatau POSCO demonstrate that the subsidies Krakatau Steel received would have flowed down to Krakatau POSCO.[57] However, as explained in the final determination, the allegation that Krakatau POSCO benefitted from other subsidies that were provided to Krakatau Steel, such as the equity infusion programs found to be countervailable in *CTL Plate from Indonesia*, does not have adequate supporting documentation showing whether the alleged subsidies that Krakatau Steel received passed on to Krakatau POSCO.[58]  Based on record evidence, we do not consider it appropriate to presume that Krakatau POSCO received a countervailable subsidy simply because its creation was funded, in part, with the assets of another company that previously received subsidies.

For similar reasons, we also disagree that there is sufficient information on the record to include the other subsidies the petitioner included in its upstream subsidy allegation.  Although the petitioner alleged that it is likely Krakatau POSCO received additional subsidies, such as debt forgiveness and land and inputs for less than adequate remuneration, Commerce relied

---

[57] *See* Petitioner Comments at 8-9.
[58] *See Final Determination* IDM at 59-63.

primarily on the record information regarding previous subsidy findings in *CTL Plate from Indonesia* in concluding that the allegation satisfied the elements required under 19 CFR 351.523(a)(1) for initiating an investigation into the upstream subsidization of CTL plate.[59]   The information the petitioner provided was insufficient to warrant an investigation into each of the subsidy programs discussed in the allegation.   Therefore, we have continued to rely on the rate for the Two-Step Loan Program from *CTL Plate from Indonesia* as facts available to determine Kenertec's upstream subsidy rate because it is the only subsidy program that was available to all CTL plate producers, including Krakatau POSCO, and is not export contingent.

**Comment 4:   Whether Commerce Should Conduct a Full Upstream Subsidy Investigation**

The petitioner argues that, if Commerce does not retain the Rediscount Loan Program in the upstream subsidy calculation or rely on record information as facts available, it should reopen the record and complete a full upstream subsidy investigation.[60]   According to the petitioner, if Commerce issues a negative final redetermination, then it will have failed to fully investigate upstream subsidization, as stipulated by section 701(e) of the Act, which states that, "{w}henever the administering authority has reasonable grounds to believe or suspect that an upstream subsidy, as defined in section 771A(a)(1), is being paid or bestowed, the administering authority shall investigate whether an upstream subsidy has in fact been paid or bestowed."[61] The petitioner posits that Commerce's determination to defer the upstream subsidy to any first administrative review was only appropriate in the context of an affirmative preliminary and final determination.   However, the petitioner argues, deferring the upstream subsidy investigation in the context of a negative determination would be in direct contravention of the Act, and it would

---

[59] *See* Upstream Subsidy Memorandum at 7-9.
[60] *See* Petitioner Comments at 11.
[61] *Id.*

have the unreasonable and unfair effect of denying the domestic industry its entitled relief under the trade remedy laws.[62]  Moreover, as Commerce stated in the *Final Determination*, the petitioner's upstream subsidy allegation was properly filed and warranted further investigation.[63]  Therefore, according to the petitioner, Commerce's decision in the Draft Redetermination fails to accord with its statutory obligations and fails to ensure domestic producers can pursue the relief afforded them under the countervailing duty law.  According to the petitioner, if Commerce does not retain the Rediscount Loan Program in the upstream subsidy calculation or rely on facts available on the record, then it must reopen the record to fulfill its statutory obligation to fully investigate the upstream subsidy allegations in order to afford the domestic industry its entitled relief.

**Commerce's Position:**

We remind the petitioner that the limited scope of the Court's *Remand Order* was to determine whether the Rediscount Loan Program is an export subsidy, which may not be included in upstream subsidy calculation.  Any other aspects of the upstream subsidy analysis, such as whether Commerce "fully" investigated the petitioner's upstream subsidy allegations, are not within the limited scope of the Court's *Remand Order*.  In accordance with the Court's order, we have determined that the Rediscount Loan Program is an export subsidy and therefore is not included in the upstream subsidy calculation for Kenertec.

**Comment 5:   Whether Commerce Should Reassess the Government Authority and Entrustment and Direction Findings**

The petitioner argues that, if Commerce does not change its upstream subsidy calculation or reopen the record to conduct an upstream subsidy investigation, it should request a voluntary

---

[62] *See* Petitioner Comments at 12.
[63] *See Final Determination* IDM at 58.

remand to reassess whether Krakatau POSCO is an authority under the Act and whether the GOI entrusted or directed Krakatau POSCO to provide CTL plate for less than adequate remuneration.

**Commerce's Position:**

We remind the petitioner that the limited nature of the Court's *Remand Order* was to determine whether the Rediscount Loan Program is an export subsidy, which may not be included in upstream subsidy calculation.  Any other aspects of the final determination, such as whether there was entrustment or direction by an authority within the meaning of section 771(5)(b)(iii) of the Act, are not within the limited scope of the Court's *Remand Order*.  In accordance with the Court's order, we have determined that the Rediscount Loan Program is an export subsidy and therefore is not included in the upstream subsidy calculation for Kenertec.

## VI.     FINAL RESULTS OF REDETERMINATION

As a result of our redetermination and after reviewing the comments on the Draft Redetermination, we maintain our finding that the Rediscount Loan Program is an export subsidy and have removed it from the upstream subsidy calculation for this Final Redetermination.  As a

result of our Final Redetermination, we find that Kenertec's rate is *de minimis*, and, therefore, we reach a negative countervailing duty determination.

☒                         ☐

Agree                Disagree

8/18/2021

X   ~~Ryan Majerus~~

Signed by: RYAN MAJERUS

_____

Ryan Majerus
Deputy Assistant Secretary
 for Policy & Negotiations