## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

PT. KENERTEC POWER SYSTEM and
WIND TOWER TRADE COALITION,

        Plaintiff and Consolidated
        Plaintiff,

    v.

UNITED STATES,

        Defendant,

    and

WIND TOWER TRADE COALITION and
PT. KENERTEC POWER SYSTEM,

        Defendant-Intervenor and
        Consolidated Defendant-
        Intervenor.

Before: Hon. Jane A. Restani,
        Senior Judge

Consol. Court No. 20-03687

## WIND TOWER TRADE COALITION'S SUPPLEMENTAL BRIEF

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: September 8, 2021

**Consol. Ct. No. 20-03687**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 1

III.    ARGUMENT ...................................................................................................... 3

      A.      Commerce Unreasonably Removed the Rate for the Rediscount Loan
           Program in its Upstream Subsidy Calculation for Kenertec ...................................3

      B.      In the Alternative, Commerce Was Required to Select Another Facts
           Available Rate to Serve as Kenertec's Upstream Subsidy Rate .............................6

      C.      In the Alternative, Commerce Must Be Required to Record the
           Record and Conduct a Full Upstream Subsidy Investigation.................................10

IV.     CONCLUSION.................................................................................................. 13

**Consol. Ct. No. 20-03687**

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

19 U.S.C. § 1671(e) ...........................................................................................................11

19 U.S.C. § 1671d(c)(5) .......................................................................................................7

19 U.S.C. § 1677-1(a) ..........................................................................................................4

19 U.S.C. § 1677-1(b) ..........................................................................................................4

19 U.S.C. § 1677-1(c) ..........................................................................................................4

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*,
      62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ...........................................7

Consol. Ct. No. 20-03687

## I.      <u>INTRODUCTION</u>

On behalf of the Wind Tower Trade Coalition ("WTTC"), we respectfully submit the

following supplemental brief regarding the U.S. Department of Commerce's ("Commerce")

August 19, 2021 Final Remand Results, in response to the Court's August 24, 2021 order

permitting such briefing.  *See* Order (Aug. 24, 2021), ECF No. 49.

## II.      <u>BACKGROUND</u>

This action arises from Commerce's final determination in the countervailing duty

("CVD") investigation into wind towers from Indonesia.  *Utility Scale Wind Towers from

Indonesia*, 85 Fed. Reg. 40,241 (Dep't Commerce July 6, 2020) (final affirm. countervailing duty

deter. and final affirm. deter. of critical circumstances), P.R. 266 ("*Final Determination*"); Issues

and Decision Memorandum, P.R. 259 ("I&D Memo").  In the final determination, Commerce

relied on facts otherwise available to find that upstream subsidies to the Indonesia cut-to-length

("CTL") plate industry exist, and that those subsidies benefited mandatory respondent PT.

Kenertec Power System's ("Kenertec") steel plate input producer Krakatau POSCO during the

period of investigation ("POI").  Commerce further found that Kenertec received a competitive

benefit from those subsidies and that the upstream subsidy had a significant effect on the cost of

manufacturing wind towers.  I&D Memo at 63.  To calculate the amount of the benefit received,

Commerce found that two loan programs from a prior *CTL Plate from Indonesia* proceeding were

applicable to producers of steel plate generally during the POI: the Two-Step Loan Program and

the Rediscount Loan Program.  *Id.* at 62.  Commerce thus relied on the rates calculated for those

two programs (0.65% for the Two-Step Loan Program and 5.05% for the Rediscount Loan

Program) and applied this rate to Kenertec, as facts otherwise available.  *Id.*  In part as a result of

these findings, Commerce calculated a final subsidy margin of 5.90% for Kenertec and for "All

Others."  *Final Determination*, 85 Fed. Reg. at 40,242.

Consol. Ct. No. 20-03687

The WTTC and mandatory respondent Kenertec each appealed aspects of the *Final Determination*. Kenertec appealed, among other issues, Commerce's inclusion of a rate for the Rediscount Loan subsidy program in the agency's calculation of the upstream subsidies it received during the POI. Defendant filed a motion for a partial voluntary remand, for Commerce to reconsider or further explain the upstream subsidy determination and, if appropriate, recalculate the CVD rate for Kenertec and all other Indonesian wind tower producers and exporters. Def.'s Mot. for Partial Voluntary Remand (July 9, 2021), ECF No. 35. The Court granted Defendant's motion for Commerce to address on remand "whether the subsidy at issue is an export subsidy, which may not be included in upstream subsidy calculation." Order (July 20, 2021), ECF No. 38.

On August 3, 2021, Commerce placed its draft remand results onto the record at the agency level, specifying a deadline of August 9, 2021 for parties' comments. In the draft remand results, the agency found that it had improperly included an export subsidy (the Rediscount Loan Program) in its upstream subsidy calculation for Kenertec and removed that export subsidy amount from the calculation, which resulted in a change in Kenertec's subsidy margin from 5.90% to *de minimis* and a negative final CVD determination. On August 4, 2021, the WTTC requested a one-week extension of the deadline to comment on the draft remand results. On August 5, 2021, the agency denied the WTTC's extension request in full. Thus, on the August 9, 2021 deadline, the WTTC submitted comments on Commerce's draft remand results.

Commerce filed its Final Remand Results with the Court on August 19, 2021, maintaining its findings in the draft remand results and issuing a negative final determination in the *Utility Scale Wind Towers from Indonesia* CVD proceeding. Final Results of Redetermination Pursuant to Ct. Remand (Aug. 19, 2021), ECF No. 43-1 ("Final Remand Results"). The WTTC filed a motion for supplemental briefing, which was granted.

Consol. Ct. No. 20-03687

III.   **ARGUMENT**

    A.   **Commerce Unreasonably Removed the Rate for the Rediscount Loan Program in its Upstream Subsidy Calculation for Kenertec**

As explained above, in its Final Remand Results, Commerce has revised its upstream subsidy calculation to remove the rate for the Rediscount Loan Program, after finding the subsidy program to be export-contingent. *See id.* at 6. This revision was improper, as there is no evidence on this record demonstrating that the Rediscount Loan Program was an export subsidy and, even if it were, Commerce was not required to remove it from its upstream subsidy calculation. That the agency did so, and did not select an alternative facts available upstream subsidy rate – with the result of reaching an overall negative final determination in the underlying investigation – was unreasonable, unsupported by substantial evidence, and contrary to law. For the reasons explained in the WTTC's July 9, 2021 Response Brief, the statute requires Commerce to either fully investigate a valid upstream subsidies allegation during the course of an investigation, or to make an affirmative determination (either of upstream subsidies, based on facts available, or based on the countervailing of other subsidy programs) so that the required investigation can be conducted in a subsequent administrative review of the order. Rendering a facts available determination that results in a *de minimis* upstream subsidy margin and a negative overall final determination is unreasonable and inconsistent with the agency's statutory obligations.

First, as Commerce acknowledges, there is no evidence on the record of this case demonstrating that the Rediscount Loan Program is an export-contingent subsidy program. Indeed, the agency cites to no such evidence. *See id.* at 6, 13. The agency merely cites to nearly 25-year-old findings in other cases to support its determination of export contingency. *Id.* at 13. When such a finding has the effect of taking an affirmative determination to an overall negative determination in the entire investigation, it is unreasonable and unduly prejudicial to the petitioner

Consol. Ct. No. 20-03687

for the agency to make such a finding based on no record evidence.  In such circumstances, the agency should be required to actually investigate the subsidy program at issue, including the gathering and assessment of facts regarding the program, prior to deciding whether or not the subsidy program is export-contingent, and Commerce failed to do so here.

Second, even if the Rediscount Loan Program were in fact export-contingent, it need not be removed from the upstream subsidy calculation, which is based on facts available, and the decision to remove it in this instance with no alternative was unreasonable.  There are two general steps to an upstream subsidy finding, as outlined in the Final Remand Results.  First, the agency must find that three elements are satisfied regarding the provision of "any countervailable subsidy, other than an export subsidy" – the <u>existence</u> of the upstream subsidy.  *See* 19 U.S.C. § 1677-1(a); Final Remand Results at 5-6.  Second, the agency must calculate the amount of the competitive benefit conferred by the upstream subsidy and include it in the CVD rate – the <u>extent</u> of the upstream subsidy.  19 U.S.C. § 1677-1(b) and (c).

These two steps must be taken separately.  First, as Commerce correctly found, the record supported, based on facts otherwise available, a determination that a countervailable subsidy, <u>other than an export subsidy</u>, was bestowed with respect to steel plate, which provided a competitive benefit to Kenertec and had a significant effect on its cost of manufacturing.  As discussed in the WTTC's Response Brief, such evidence included the fact that Commerce had found steel plate producers to benefit from various countervailable subsidies in the past and thus continued to maintain a CVD order on *CTL Plate from Indonesia*, evidence that Krakatau Steel was benefiting from debt forgiveness, and evidence that Krakatau POSCO received land, electricity, and inputs for less than adequate remuneration ("LTAR").  *See* WTTC Resp. Br. (July 9, 2021) at 28, ECF No. 32 ("WTTC Response Brief").  Many, if not all, of these subsidy programs are not export-

Consol. Ct. No. 20-03687

contingent and thus appropriately serve as a basis for a finding that non-export countervailable subsidies were conferred with respect to steel plate.  For example, the WTTC submitted evidence showing that subsidization of Indonesian plate producer and state-owned entity Krakatau Steel was ongoing in the form of debt forgiveness through the Indonesian government's entrustment and direction of public and private banks.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers From Indonesia: Upstream Subsidy Allegation* (Feb. 3, 2020) at 6-7 and Exhibit 3, C.R. 234-235, P.R. 207-208; Memorandum from Melissa Kinter, through Andrew Medley, to Melissa G. Skinner, re: *Countervailing Duty Investigation of Utility Scale Wind Towers from Indonesia: Upstream Subsidy Allegation* (Mar. 12, 2020) at 4, C.R. 242, P.R. 231 ("Upstream Subsidy Allegation Memo").  This is a non-export-contingent subsidy and it, along with other evidence, serves as substantial evidence supporting a determination that a countervailable subsidy, other than an export subsidy, was bestowed with respect to steel plate, which provided a competitive benefit to Kenertec and had a significant effect on its cost of manufacturing.

Next, after finding that an upstream subsidy was conferred, Commerce was required to calculate the amount of the subsidy granted, to be included in Kenertec's CVD rate.  Given the timing of the determination, Commerce decided to base its calculation on facts otherwise available. I&D Memo at 62.  The agency need not determine that steel plate producers received export subsidies from the Rediscount Loan Program and that those subsidies flowed through to Kenertec, because, as noted above, there is evidence of other, non-export subsidy programs on the record. Yet, Commerce can still rely on the rate calculated for the Rediscount Loan Program as facts available in this second, separate step of the analysis, to calculate the <u>amount</u> of the upstream subsidy conferred.  In other words, Commerce can rely on this previous steel plate subsidy rate as facts available, as a "stand in" for the non-export upstream subsidies that it was unable to verify

Consol. Ct. No. 20-03687

during the investigation.  Relying on this rate for the limited purposes of calculating the benefit amount, as facts otherwise available, is consistent with the statute and its definition of an upstream subsidy.

In sum, Commerce could rely on the substantial evidence of non-export subsidies on the record to find the <u>existence</u> of the upstream subsidy, and it could rely on the Rediscount Loan Program as facts otherwise available to measure the <u>extent</u> of the upstream subsidy.  That the agency determined to do otherwise on remand, and without even replacing the Rediscount Loan Program rate with another rate, was unreasonable and unduly prejudicial to the WTTC.  While it was reasonable for Commerce to rely on facts otherwise available to make an affirmative determination of upstream subsidization and to select an above-*de minimis* rate for the program, it was <u>not</u> reasonable for Commerce rely on facts otherwise available rate to select a *de minimis* rate for the program.  That Commerce did so in this instance, when it was not required to do so, shuts off the entire proceeding and thereby means that the agency will never actually investigate the WTTC's upstream subsidy allegation, in contravention of the statute.  *See* WTTC Response Brief at 19-20.  It further has the unreasonable and unfair effect of denying relief to the domestic industry to which it was entitled under the trade remedy laws.

## B.  <u>In the Alternative, Commerce Was Required to Select Another Facts Available Rate to Serve as Kenertec's Upstream Subsidy Rate</u>

To prevent the wholly unreasonable result of never fully investigating the WTTC's upstream subsidies allegation and denying the domestic industry all relief as a result of a facts available determination, upon Commerce's decision on remand to remove the Rediscount Loan Program from its upstream subsidies calculation, it was required to select an alternative facts available upstream subsidy rate.   There is substantial evidence on the record supporting Commerce's determination that Kenertec did benefit from an upstream subsidy.  To then select as

Consol. Ct. No. 20-03687

facts available a rate that results in a *de minimis* rate for Kenertec and a negative overall CVD determination is contrary to the finding that Kenertec did indeed benefit from an upstream subsidy and unduly prejudicial to the WTTC. Rather than issuing a negative determination without even conducting an investigation, Commerce must select an alternative facts available rate. Thus, even if the Court sustains Commerce's determination on remand to remove the rate for the Rediscount Loan Program from its upstream subsidies calculation, it should again remand the determination to the agency to select an alternative facts available rate from among the various reasonable options on the record.

The WTTC outlined these options to the agency in its comments on the draft remand results. First, Commerce should select the 15.90% all-others rate calculated in the *CTL Plate from Indonesia* proceeding. Commerce's reasoning that Krakatau POSCO itself would not have benefited from each program contained in that 15.90% rate is unavailing. The Tariff Act of 1930 states that the agency shall calculate "the all-others rate shall be an amount equal to the weighted average countervailable subsidy rates established for exporters and producers individually investigated . . . ." Section 705(c)(5) of the Tariff Act of 1930, *codified as amended at* 19 U.S.C. § 1671d(c)(5). Commerce itself explained in the Preamble that in a CVD proceeding, "{i}f the producer's rate is applicable, but the Department has not established a rate for that producer, the Department will apply the 'all-others' rate." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,303 (Dep't Commerce May 19, 1997). Thus, Commerce routinely applies CVD rates to companies based on the investigation's results for the mandatory respondents, without specifically finding that each individual producer benefited from each particular subsidy program.

Moreover, Commerce used the 15.90% all-others rate in testing to satisfy the initiation requirements for the upstream subsidy allegation. I&D Memo at 59. The agency also noted that

7

Consol. Ct. No. 20-03687

"Krakatau POSCO is subject to the 'all others' rate in the *CTL Plate from Indonesia* order because it is a producer of CTL plate in Indonesia . . . ." *Id.* at 60-61. Commerce also determined that Krakatau Steel and Krakatau POSCO were separate entities, noting that "Krakatau POSCO is a private entity, unlike Krakatau Steel." *Id.* at 59. However, when calculating the subsidy bestowed to Krakatau POSCO by the Government of Indonesia ("GOI"), rather than using as facts available the all-others rate of 15.90%, the agency arbitrarily decided that the starting point of its calculations was Krakatau Steel's subsidy rate of 47.71%. The agency then unnecessarily and conclusorily analyzed whether each individual subsidy received by Krakatau Steel would have applied to Krakatau POSCO. Yet, if Krakatau POSCO exported CTL plate to the United States during the POI, its shipments would be subject to duties at the all-others rate of 15.90%. Simply put, there is no requirement to analyze individual programs when the company has not been previously investigated and is subject to the all-others rate. At all other stages of its upstream subsidy analysis, Commerce correctly recognized and applied the all-others rate of 15.90% to Krakatau POSCO. Thus, should the agency continue to remove the Rediscount Loan Program rate from the upstream subsidies calculation, the Court should remand to Commerce for selection of an alternative rate, where Commerce should rely on a facts available upstream subsidy rate of 15.90% for Kenertec.

As another reasonable option for an alternative, facts available, upstream subsidy rate if Commerce insists on removing the Rediscount Loan Program rate, rather than selecting a *de minimis* rate, would be Krakatau Steel's rate from the *CTL Plate from Indonesia* proceeding. Commerce refused to rely on this rate in the final determination because it concluded that "Krakatau POSCO was not created until 2010 and could not have participated in the initial investigation of CTL plate from Indonesia." *Id.* at 60. However, it does not follow that the benefits found to be granted to Krakatau Steel – Krakatau POSCO's joint venture owner – as well as other

Consol. Ct. No. 20-03687

Indonesian CTL plate producers would not have flowed down to benefit Krakatau POSCO and are not representative of the current upstream subsidization rate of Krakatau POSCO.   Commerce found that "{f}orty percent of the funds raised in Krakatau Steel's 2010 initial public offering (IPO) went into the creation of Krakatau POSCO . . . ."   Preliminary Decision Memorandum accompanying *Utility Scale Wind Towers From Indonesia*, 84 Fed. Reg. 68,109 (Dep't Commerce Dec. 13, 2019) (prelim. affirm. countervailing duty deter. and alignment of final deter. with final antidumping duty deter.) at 9, P.R. 183.   *See also* Upstream Subsidy Allegation Memo at 4-5. Commerce also determined that Krakatau Steel is an authority within the meaning of section 771(5)(B) of the Act.   I&D Memo at 25.   This, combined with substantial additional record evidence, demonstrates a direct link between Krakatau Steel, and the subsidies received by Krakatau Steel, and the establishment and continued operations of Krakatau POSCO.   Krakatau POSCO received an equity infusion from its joint venture owner and a GOI authority, and the use of that authority's CVD rate without any adjustment is appropriate on a facts available basis.

As yet another reasonable option for a facts-available upstream subsidy rate, Commerce could reasonably have assessed the subsidies available to Krakatau POSCO on a program-specific basis and included rates for all subsidy programs on which Commerce's upstream subsidy investigation initiation decision was based, regardless of whether these subsidies were previously investigated in *CTL Plate from Indonesia*.   The Upstream Subsidy Allegation Memo notes that the WTTC alleged not only the subsidies from *CTL Plate from Indonesia* but also various "Land, Inputs and Electricity for LTAR" subsidy programs.   *See* Upstream Subsidy Allegation Memo at 6.   For example, Commerce noted the WTTC's argument that government authority "Krakatau Steel provided the land on which Krakatau POSCO was built (adjacent to Krakatau Steel) and Krakatau POSCO depends entirely on Krakatau Steel for provision of water, electricity, and access

Consol. Ct. No. 20-03687

to the port for raw materials." *Id.* at 4-5.  However, while it noted that it was relying on information that the WTTC provided in its upstream subsidy allegation in making its findings, Commerce failed to include rates for these other subsidies in its facts available calculation of Krakatau POSCO's upstream subsidy rate.  These subsidies are: Equity Infusion for Krakatau POSCO;[1] Electricity for LTAR;[2] Land for LTAR; Slab for LTAR; and Other Inputs for LTAR (*i.e.*, coking coal and iron ore).[3]

With multiple appropriate alternative facts available rates on the record, it was wholly unreasonable and unlawful for the agency to determine to rely on a single subsidy program's rate as the entire upstream subsidy rate – a rate which results in a *de minimis* margin and a negative final CVD determination.  Thus, should the Court affirm Commerce's removal of the Rediscount Loan Program rate from Kenertec's upstream subsidy rate, the Court should remand to Commerce for consideration and selection of an alternative facts available upstream subsidy rate, including an assessment of the alternative rate options outlined above.

**C.    In the Alternative, Commerce Must Be Required to Record the Record and Conduct a Full Upstream Subsidy Investigation**

Should the Court affirm Commerce's determination to remove the Rediscount Loan Program rate from the upstream subsidies calculation, and should it determine not to remand to

---

[1]    The record supports finding the Krakatau POSCO benefited from an equity infusion from Krakatau Steel.  Consequently, Commerce can find on a facts available basis that Krakatau POSCO received a subsidy of 16.21% based on the 1995 Equity Infusion in Krakatau program. *See* I&D Memo at 60.

[2]    For the Electricity for LTAR program, the agency found that Kenertec received a countervailable subsidy in the amount of 0.17%.  I&D Memo at 7.  Commerce can reasonably apply this same rate to Krakatau POSCO on a facts available basis.

[3]    For these remaining subsidy programs (Land, Slab, and Other), Commerce could re-open the record to calculate a rate, select an affirmative facts available rate for a similar program from a prior proceeding, or, if the final determination is otherwise affirmative, defer the calculation of rates for these additional programs to the first administrative review.

Consol. Ct. No. 20-03687

Commerce for selection of an alternative facts available upstream subsidy rate, the Court should remand Commerce's determination for the agency to reopen the record and conduct a full upstream subsidy allegation.

19 U.S.C. § 1671(e) specifies that "{w}henever the administering authority has reasonable grounds to believe or suspect that an upstream subsidy . . . is being paid or bestowed, the administering authority <u>shall investigate</u> whether an upstream subsidy has in fact been paid or bestowed, and if so, shall include the amount of the upstream subsidy . . . ." 19 U.S.C. § 1671(e) (emphasis added). As explained in the WTTC's Response Brief, it was appropriate for the agency to make an affirmative upstream subsidy finding and affirmative overall final determination based on facts available, rather than conducting a full investigation. In such a case, Commerce would have the opportunity to fully investigate the upstream subsidy in an administrative review of the CVD order. However, it is <u>not</u> appropriate, or lawful, for the agency to make a negative overall final determination based on facts available, rather than conducting a full investigation, because Commerce then forecloses any possibility for it to fulfill the statute's requirement to investigate an upstream subsidy. *See id.*

As previously discussed, the agency initiated on the WTTC's upstream subsidy allegation on March 12, 2020, Upstream Subsidy Allegation Memo, but did not solicit any additional information from Kenertec or the GOI in the fifteen weeks between initiating the upstream subsidy initiation and final determination. At the final determination, the agency reaffirmed that the WTTC's upstream subsidy was properly filed, and "agree{d} with the {WTTC} that further analysis of the upstream subsidy allegation {was} warranted in this investigation." I&D Memo at 57. Commerce also acknowledged that the WTTC "has requested that we fully investigate the existence and extent of upstream subsidies provided to CTL plate producers." *Id.* at 58. However,

11

Consol. Ct. No. 20-03687

Commerce failed to fully investigate the existence and extent of the upstream subsidies.  This decision was appropriate only when Commerce reached an affirmative determination, thus providing a future opportunity for a full investigation of upstream subsidies.

Commerce's decision in the Final Remand Results fails to accord with its statutory obligations and fails to ensure domestic producers can pursue the relief afforded them under CVD law.  As Commerce recognized in its final determination, these laws are "intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from . . . subsidies paid by their governments."  *Id.* at cmt. 6 (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 456 (1978)).  The WTTC timely sought relief provided under the upstream subsidy allegation.  Sustaining the agency's Final Remand Results as they currently stand, however, prevents the WTTC from developing its allegation further during the investigation or in a future administrative review and precludes the agency from ever fully investigating the allegation.  Accordingly, if the Court does not remand the determination to Commerce for assessment of an alternative facts available rate that results in an affirmative determination, the Court should remand to Commerce in order for the agency to reopen the record, fully investigate the properly alleged upstream subsidy allegation, and accurately measure the amount of subsidies bestowed.

Consol. Ct. No. 20-03687

IV.    <u>**CONCLUSION**</u>

For the reasons detailed above, the WTTC respectfully submits that this Court should reject Commerce's Final Remand Results, which result in a negative final determination in Commerce's CVD investigation into Indonesian wind towers, and again remand to the agency for further assessment of the upstream subsidy benefit calculation, consistent with the foregoing discussion.

Respectfully submitted,

<u>/s/ Alan H. Price</u>
Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

Dated: September 8, 2021

13

CERTIFICATE OF COMPLIANCE

Pursuant to the Court's August 24, 2021 order, the undersigned certifies that this supplemental brief complies with the word limitation requirement. *See* Order (Aug. 24, 2021), ECF No. 49. The word count for Wind Tower Trade Coalition's Supplemental Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 3,867 words.

*/s/ Alan. H. Price*
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Wind Tower Trade Coalition
(Representative Of)

September 8, 2021
(Date)