Slip Op. 21-175

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PT. KENERTEC POWER SYSTEM,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 20-03687** |
| Defendant, | **PUBLIC VERSION** |
| **WIND TOWER TRADE COALITION,** | |
| Consolidated Plaintiff and Defendant-Intervenor. | |

## OPINION

[Sustaining the U.S. Department of Commerce's final negative determination as amended on remand in the countervailing duty investigation of utility-scale wind towers from Indonesia.]

Dated: December 28, 2021

Daniel Robert Wilson, and Henry David Almond Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for Plaintiff PT. Kenertec Power System. With them on the brief were Jaehong David Park, Henry Bowman Morris, Kang Woo Lee, Leslie Claire Bailey, and Michael Tod Shor.

Elizabeth Anne Speck, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the Defendant. With her on the brief were Patricia Mary McCarthy, and Joshua Ethan Kurland. Of counsel was Saad Younus Chalchal, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Robert Edward DeFrancesco, III, Wiley Rein, LLP, of Washington, DC, argued for Defendant-Intervenor Wind Tower Trade Coalition. With him on the brief were Alan Hayden Price, Daniel Brian Pickard, Derick G. Holt, Elizabeth Seungyon Lee, John Allen Riggins, Laura El-Sabaawi, Maureen Elizabeth Thorson, Robert Edward DeFrancesco, III, Tessa Victoria Capeloto, and Theodore Paul Brackemyre.

Restani, Judge:  Before the court is a motion for judgment on the agency record pursuant to United States Court of International Trade ("USCIT") Rule 56.2, in an action challenging findings in both the final determination and the final remand redetermination of the United States Department of Commerce ("Commerce").  See Utility Scale Wind Towers from Indonesia, 85 Fed. Reg. 40,241 (Dep't Commerce July 6, 2020) ("Final Determination"); Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Utility Scale Wind Towers from Indonesia, C-560-834, POI: 01/1/2018-12/31/2018 (Dep't Commerce June 29, 2018) ("IDM"); Final Results of Redetermination Pursuant to Court Remand, ECF No. 43 ("Final Remand Redetermination").  The final determination and final remand redetermination at issue resulted from Commerce's countervailing duty ("CVD") investigation of utility-scale wind towers from Indonesia.

The extant issues arising respectively from the final determination and the final remand redetermination are: 1) whether Commerce's determination that Krakatau POSCO was neither an authority nor entrusted or directed by the Indonesian government to provide cut-to-length steel plate ("CTL Plate") to Kenertec at less-than-adequate renumeration ("LTAR") is supported by substantial evidence, and 2) whether Commerce's determination that the Rediscount Loan Program is an export subsidy, and thus excluded from the upstream subsidy calculation, is supported by substantial evidence.  After the final remand redetermination, both the Government and Plaintiff PT. Kenertec Power System ("Kenertec") maintain that Commerce's determinations are supported by substantial evidence and in accordance with law.  See PT. Kenertec Resp. to WTTC R.56.1 Mot. for J. on the Agency Record, ECF No. 31 (July 9, 2021); PT Kenertec Resp. to WTTC Supp. Br. at 9–10, ECF No. 56 (Sept. 21, 2021); Gov't Op. to R. 56.2 Mot. for J. on

the Agency Record at 59, ECF No. 34 (July 9, 2021) ("Gov't Br."); Gov't Resp. to WTTC Supp.

Br. at 14, ECF No. 55 (Sept. 17, 2021) ("Gov't Supp. Br.")  Plaintiff-intervenor Wind Tower

Trade Coalition ("WTTC") contests Commerce's determinations.  See WTTC Resp. to Kenertec

Mot. for J. on the Agency Record Br., ECF No. 36 (July 12, 2021) ("WTTC Br."); WTTC

Supplemental Brief at 13, ECF No. 56 (Sept. 8, 2021) ("WTTC Supp. Br.").  The court sustains

the final determination as amended by the final remand redetermination.

## BACKGROUND

On July 9, 2019, WTTC submitted a countervailing duty petition to Commerce regarding imports of wind towers from Indonesia.  See Petitioner's Letter, Petitions for the Imposition of Antidumping and Countervailing Duties on Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam, C.R. 1–33, P.R. 1–33 (July 9, 2019).  WTTC alleged that an Indonesian wind tower producer had purchased CTL Plate for LTAR.  See id.

On July 29, 2019, Commerce initiated a CVD investigation of inter alia an alleged provision of CTL Plate for LTAR.  Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam, 84 Fed. Reg. 38,216 (Dep't Commerce Aug. 6, 2019) ("Initiation Notice").  The period of investigation ("POI") was January 1, 2018 through December 31, 2018. Initiation Notice, 84 Fed. Reg. at 38,217.  During the POI, Commerce identified Kenertec as the only known company with U.S. exports.  Initiation Notice, 84 Fed. Reg. at 38,219. Commerce found that Kenertec reported it only purchased CTL Plate from PT. Krakatau POSCO ("Krakatau POSCO") during the POI.  See Kenertec's September 23, 2019 Countervailing Duty Questionnaire Response at 12 (citing Ex. INPUT-1), C.R. 56–66, P.R. 99 (Sept. 23, 2019)

("Kenertec's Sept. 23 Resp."). Krakatau POSCO is a joint venture of POSCO, a private Korean steel company, and PT. Krakatau Steel ("Krakatau Steel"), a government-owned Indonesian company. The Government of Indonesia controls Krakatau Steel as the majority shareholder. See Government of Indonesia's Sept. 27, 2019 Questionnaire Response at 10, C.R. 83–110, P.R. 102–128 (Sept. 17, 2019) ("GOI QR").

On December 13, 2019, Commerce published its affirmative preliminary determination and found that Kenertec had received countervailable subsidies at an estimated ad valorem net subsidy rate of 20.29 percent. Utility Scale Wind Towers from Indonesia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination, 84 Fed. Reg. 68,109, 68,110 (Dep't Commerce Dec. 13, 2019) ("Preliminary Determination"); Decision Memorandum for the Preliminary Determination of the Countervailing Duty Investigation of Utility Scale Wind Towers from Indonesia, C-560-834, POI 1/1/2018–12/31/2018, P.R. 183 (Dep't Commerce Dec. 6, 2019) ("PDM") at 7–18. Commerce preliminarily determined that Kenertec's purchases of CTL Plate were a countervailable financial contribution because it found that the Government of Indonesia had entrusted and directed Krakatau POSCO to provide CTL Plate for LTAR. See PDM at 7–16; see also Government of Indonesia's Nov. 4, 2019, First Supplemental Questionnaire Response at Ex. GOI-SUPP-3, GOI-SUPP-10, C.R. 148–149, P.R. 156–57 ("GOI SQR").

Two months later, on February 3, 2020, WTTC submitted a timely additional allegation that CTL Plate producers in Indonesia, including Krakatau POSCO, had received countervailable upstream subsidies that had passed through to Kenertec. Letter from Petitioner, Upstream Subsidy Allegation, C.R. 234–35, P.R. 207–8 (Feb. 4, 2020) ("Upstream Subsidy Allegation").

Commerce initiated an investigation because it found that the allegation provided a reasonable basis to believe or suspect the existence of a CVD upstream subsidy under 19 U.S.C. §1677-1(a) and 19 C.F.R. § 351,523(a)(1).  See Memorandum from Dep't Commerce, Upstream Subsidy Allegation at 2–9, C.R. 242, P.R. 231 (Mar. 12, 2020) ("Upstream Subsidy Memorandum").  Commerce then decided to defer its upstream subsidy investigation pursuant to 19 U.S.C. § 1671b(2)(B)(i) until after the final determination.  See Upstream Subsidy Memorandum at 1–2; Utility Scale Wind Towers from Canada, Indonesia, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations of Countervailing Duty Investigations, 84 Fed. Reg. 48,329 (Sept. 13, 2019).

　　　　On July 6, 2020, Commerce published its final determination.  See Final Determination, 85 Fed. Reg. 40,241l.  Commerce concluded that Krakatau POSCO was not an authority because the record evidence on balance showed that neither the Indonesian government itself nor Krakatau Steel exerted meaningful control over the joint venture.  Id.; IDM at 33.  Commerce also reconsidered the decision to defer its investigation of upstream subsidization of CTL Plate, see IDM 57–58; Upstream Subsidy Memorandum at 9, and ultimately proceeded with that upstream subsidy investigation.  See IDM at 59–63.

　　　　After briefing before the court, Commerce requested a partial remand to address Kenertec's argument that the Rediscount Loan Program included in Commerce's upstream subsidy calculation was an export subsidy not cognizable as an upstream subsidy.  Gov't Mot. for Partial Voluntary Remand, ECF No. 35 (July 9, 2021).  On July 20, 2021, the court granted the motion permitting a limited remand proceeding.  Order, ECF No. 38 (July 20, 2021).  Pursuant to the court's order, Commerce filed its final remand redetermination on August 19,

2021.  See Final Remand Redetermination.  In the final remand redetermination, Commerce determined that the Rediscount Loan Program was export contingent, excluded the subsidy in the upstream calculation, and reached a negative CVD determination.  See id. at 6.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2021).  The court will uphold Commerce's determinations in a countervailing duty proceeding unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce Properly Found That Krakatau POSCO Is Neither an Authority nor Directed or Entrusted by an Authority

A subsidy is countervailable if the following elements are satisfied: 1) an authority has provided a financial contribution directly, or entrusts or directs a private entity to make a financial contribution; 2) a benefit is thereby conferred on a recipient of the financial contribution; and 3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  19 U.S.C. § 1677(5)(A)–(B), (D)–(E), (5A).  In the final determination, Commerce found that that the purchases of CLT Plate were not a financial contribution under the statute, because Krakatau POSCO is neither an "authority" nor a private entity whom the Indonesian government "entrusts or directs."  See 19 U.S.C. § 1677(5), (5)(B)(iii).  Commerce and Kenertec find themselves in alignment, and both parties now ask the court to sustain the Commerce's final determination.  WTTC disagrees and asserts that Commerce improperly disregarded record evidence in reaching the final determination.  For the

following reasons, the court holds that Commerce's analysis is in accordance with law and supported by substantial evidence.

### A. Commerce Properly Found That Krakatau POSCO Is not Itself an Authority Within the Meaning of 19 U.S.C. § 1677(5)(B)

Commerce first found that Kenertec was a privately-owned producer of wind towers in Indonesia, and that Krakatau POSCO was Kenertec's sole Indonesian CTL Plate provider during the POI. Kenertec's Sept. 23 Resp. at Ex. INPUT-1; PDM at 8. In the final determination, Commerce found that Krakatau POSCO is not an authority under 19 U.S.C. § 1677(5)(B), and therefore the CTL Plate it sold to Kenertec was not a countervailable financial contribution from an authority. Final Determination 85 Fed. Reg. at 40,243; IDM at 31–33. Commerce considered evidence regarding the circumstances of Krakatau POSCO's corporate ownership, management structure, and voting procedures to reach its determination. See IDM at 31-33; see also GOI QR at Ex. GOI-CTL-1, Ex. GOT-CTL-3 at Ch. 8, Ex. GOI-CTL-12; GOI SQR at Ex. GOI-SUPP-3.

The statute defines "authority" as "a government of a country or any public entity within the territory of the country." 19 U.S.C. § 1677(5)(B). "Public entity," is not a defined term, and therefore Commerce receives substantial deference in its interpretation. Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 37 CIT 1276, 61 F. Supp. 3d 1306, 1314 (2015); see Guangdong Wireking Housewares & Hardware Co. v. United States, 37 CIT 319, 900 F. Supp. 2d 1362, 1377 (2013), aff'd, 745 F.3d 1194 (Fed. Cir. 2014). Evidence of government ownership, although highly relevant, is not dispositive. See Borusan, 61 F. Supp. 3d at 1320 (finding that the analysis is not "limited to consideration of corporeal voting rights and other corporate formalities"). In the final determination, Commerce analyzed Krakatau POSCO's

Court No. 20-03687 Page 8
**Public Version**

corporate governance structure and cited record evidence in three categories to support its finding that Krakatau POSCO was not an authority under 19 U.S.C. § 1677(5)(B). See IDM at 31–33.

To support its finding Commerce first considered Krakatau POSCO's ownership structure. Commerce identified Krakatau POSCO as a joint venture of POSCO, a private Korean steel company, and Krakatau Steel, a majority Indonesian government-owned company. See GOI QR at 8-10; IDM at 31–32. Further, Commerce found that Krakatau POSCO was 70 percent owned by POSCO, with the remaining 30 percent owned by Krakatau Steel. IDM at 31-32; see GOI SQR at Ex. GOI-SUPP-3 Art 3. Commerce concluded that based on ownership alone, the Krakatau POSCO joint venture was primarily controlled by POSCO, a private company, not the Government of Indonesia. IDM at 32.

Next, Commerce considered Krakatau POSCO's management structure, which included a primary management Board of Directors ("BOD") and supervisory Board of Commissioners ("BOC"). See GOI QR at Ex. GOI-CTL-1; GOI SQR at Ex. GOI-SUPP-3. The BOD was comprised of [[   ]] members. POSCO was authorized to appoint [[   ]] members, and Krakatau Steel was authorized to appoint [[   ]] members to the BOD. See GOI QR at Ex. GOI-CTL-12. The primary duty of the BOD was to [[

]]. GOI QR at Ex. GOI-CTL-12. The BOD [[


]] See GOI SQR at Ex. GOI-CTL-12 Art. 8 (emphasis added). The Government of Indonesia further explained that [[

*Confidential Information Omitted*

]] GOI QR at 52–53 (emphasis added).

The BOC was comprised of four members. POSCO and Krakatau Steel were each authorized to appoint [[   ]] members to the BOC.  Id.  Krakatau Steel was also authorized to nominate the [[                                ]] whose role was to provide: [[

]] See GOI QR at Ex. GOI-CTL-12 Art. 15 (emphasis added).  In the final determination Commerce found that Krakatau Steel board members, who served on either the BOD or BOC, did not exert meaningful control over Krakatau POSCO's operations during the period of investigation.  IDM at 32.

Finally, Commerce considered Krakatau POSCO's voting rights:

> Each director casts one vote and decisions are made [[
>                                      ]] A quorum exists if
> [[
>      ]]  If a quorum is not achieved, then [[
>      ]], and in the [[            ]] a quorum exists [[
>
>      ]]

Memorandum from Dep't Commerce, Additional Analysis Regarding the Final Determination at 2, C.R. 263, P.R. 262 (July 1, 2020) (citing GOI QR at 52–53, Ex. GOI-CTL-12) ("Commerce Final Determination Add'l Analysis Memorandum").  Additionally, certain decisions by the BOD [[

*Confidential Information Omitted*

]] GOI QR at Ex. GOI-CTL-12 Art. 11. Considering the Articles of Association and Joint Venture Agreement, Commerce concluded that Krakatau POSCO's BOD may adopt binding resolutions without any involvement or control from Krakatau Steel, because POSCO's [[　　]] BOD members represented a majority. Commerce Final Determination Add'l Analysis Memorandum at 2; see IDM at 32–33.

　　　　WTTC challenges Commerce's determinations on several counts. Primarily, WTTC contends that Commerce disregarded record evidence and did not adequately address the role of the BOC, asserting that Krakatau Steel's presence on the BOC provided it and the Indonesian government with meaningful control over Krakatau POSCO. See WTTC Mem. in Supp. of their R.56.1 Mot. for J. on the Agency Record at 17-19, 26-27, ECF No. 21 (Apr. 7, 2021) ("WTTC Motion"). Here, the petitioner's argument fails primarily because it overstates the role of the BOC, and it is plainly incorrect regarding the lack of record evidence to support Commerce's final determination. Commerce preliminarily determined that the BOC was the "ultimate supervisory organ of the company." PDM at 10; see also Preliminary Determination, 84 Fed. Reg. at 68,110. Following further investigation, however, Commerce reasonably determined that the BOD and not the BOC maintained organizational control of Krakatau POSCO for the reasons previously stated. See IDM 32-33; see also Commerce Final Determination Add'l Analysis Memorandum at 1–2.

　　　　Next WTTC challenged POSCO's comparative strength on both the BOC and BOD if a quorum is not reached. WTTC alleges that if a [[　　　　　]] quorum is not reached for a BOD meeting; the procedure requires the meeting to be [[

*Confidential Information Omitted*

Court No. 20-03687 Page 11
**Public Version**

]] GOI QR at Ex. GOI-CTL-12 Arts. 11, 22. Under these limited, hypothetical circumstances, WTTC alleges that the [[                                    ]] can adopt binding resolutions "without any involvement of POSCO." WTTC Motion at 16–17. WTTC could point to no record evidence of the minority BOD members exerting control in such a way during the POI. Further, the quorum rules still require [[                              ]] to proceed, nullifying the argument that minority BOC members can exert control without "any" POSCO involvement. See id.; GOI QR at Ex. GOI-CTL-12 Art. 12. Therefore, Commerce's decision to consider, and reject, WTTC's argument is reasonable and supported by record evidence.

Finally, WTTC argued that major operational decisions require [[

                                    ]] through its 30 percent control of the joint venture. Commerce did not find WTTC's reasons compelling, citing Krakatau POSCO's Articles of Association by-laws. See GOI QR at Ex. GOI-CTL-12 Art. 11; IDM at 32. Commerce explained that if the requirement of [[

                                    ]] See IDM at 32; Gov't Br. at 20; see also GOI QR at Ex. GOI-CTL-12 Arts. 11, 22.

Commerce asserts that on balance, the Government of Indonesia, through Krakatau Steel, did not exert meaningful control over Krakatau POSCO during the POI. On these facts, the court cannot say that Commerce erred in its finding that Krakatau POSCO is not a government authority under 19 U.S.C. § 1677(5)(B).

*Confidential Information Omitted*

Court No. 20-03687 Page 12
**Public Version**

### B. Commerce Properly Found That the Indonesian Government Did Not Entrust or Direct Krakatau POSCO to Provide CTL Plate to Kenertec Pursuant to 19 U.S.C. § 1677(5)(B)(iii)

Under 19 U.S.C. § 1677(5)(B)(iii), a countervailable subsidy may be provided by an authority who "entrusts or directs a private entity to make a financial contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments." 19 U.S.C. § 1677(5)(B)(iii). Commerce asserts that the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act establishes guidance that authorizes Commerce to analyze this issue on a case-by-case basis. See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 925–26 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4209, 4239–40 ("SAA"). When there is no direct legislation to entrust or direct private parties to provide a financial contribution, Commerce relies on circumstantial information to determine whether there was entrustment or direction. See Hynix Semiconductor, Inc. v. United States, 29 CIT 995, 1005–6, 391 F. Supp. 2d 1337, 1347–48 (2005).

Absent direct evidence that the government entrusted or directed a private entity to provide a financial contribution, Commerce applies a two-part test to examine: "1) whether the government has in place during the relevant period a governmental policy to support the respondent; and 2) whether evidence on the record establishes a pattern of practices on the part of the government to act on that policy to entrust or direct the associated private entity decisions." [1] Id. In the final determination, Commerce found that the Government of

---

[1] The prototypical case involves a government implementing "direct legislation to entrust or direct private parties to provide a financial contribution." Biodiesel from the Republic of Indonesia: Final Affirmative Countervailing Duty Determination, 82 Fed. Reg. 53,477 (Nov. 16, 2017), and accompanying Issues and Decision Memorandum, at 20.

Indonesia's policy to support the wind tower industry during the period of investigation met the requirements of the first prong. IDM at 27. This appears undisputed. Commerce, however, did not find an established "pattern of practices" under the second prong. IDM at 30. Commerce ultimately declined to find that the Government of Indonesia entrusted or directed Kenertec POSCO to provide a countervailable financial contribution. Id.

Commerce preliminarily determined that established practices of the Indonesian government satisfied the second prong of the test. See PDM at 12. Commerce based this finding on the Government of Indonesia's "Master Plan of National Industry Development 2015-2035 of the Republic of Indonesia" ("RIPIN"); the existence of a plan to develop a steel cluster in a region of Cilegon as support for Krakatau Steel's significant influence on Krakatau POSCO; and the alignment of Krakatau POSCO's objectives with government policies. PDM at 12; see GOI SQR Ex. GOI-SUPP-10 ("RIPIN") at 19–21). In the final determination, however, Commerce reversed its position and found that the Indonesian government had not met the second prong. IDM at 30. Commerce adequately supported its new decision with record evidence.

First, Commerce accepted clarifications from the Indonesian government about the RIPIN. See GOI SQR at 18–20; see also Government of Indonesia's Nov. 22, 2019 Second Supplemental Questionnaire Response at 2–3, C.R. 219, P.R. 180 (Nov. 22, 2019) ("GOI SSQR"). The Indonesian government submitted a verification report that framed the Cilegon steel cluster not as a governmental plan, but as a long-term commercial goal independently established by Krakatau Steel and Krakatau POSCO. See GOI SSQR at 2–3. In its clarifications, the Government of Indonesia described the RIPIN as a non-binding aspiration guideline, as opposed to a "pattern of practices." See GOI SQR at 18–20. Neither the Cilegon

cluster, nor Krakatau Steel or Krakatau POSCO are mentioned in the RIPIN. GOI SQR at Ex. GOI-SUPP-1. Further evidence supports that Krakatau POSCO's long-term commercial strategy towards the Cilegon cluster was independent of the Government of Indonesia's development plan because: 1) Krakatau POSCO's business plan towards the Cilegon cluster predates the RIPIN, and 2) "Krakatau Steel and Krakatau POSCO's crude steel capacity goal remains unchanged since it was initially set, which suggests there was no attempt to align production with governmental policies." IDM at 27–28; see also GOI SQR at 20, Ex. GOI-SUPP-10 at 23–27.

Second, as discussed, Commerce amended its preliminary understanding of Krakatau POSCO's corporate governance. Compare Preliminary Determination 84 Fed. Reg. at 68,110. with Final Determination 85 Fed. Reg. at 40,243; see also IDM at 29. Commerce found that Krakatau Steel held a [[           ]] ownership of the joint venture Krakatau POSCO and did not exert control over Krakatau POSCO through either the BOD or the supervisory BOC. See IDM at 32. Without this link the finding of entrustment or direction was undermined, and Commerce's final determination was substantially supported.

**II.     Commerce Properly Reached a Negative Upstream Subsidy Determination**

In its final determination, Commerce found an ad valorem net countervailable subsidy rate of 5.90 percent for Kenertec. Final Determination, 85 Fed. Rep. at 40,242. Pursuant to its decision on remand, Commerce reversed course and reached a negative CVD determination based on a de minimis subsidy rate. Final Remand Redetermination at 21–22. Specifically, Commerce found that the Rediscount Loan Program, found to be a countervailable subsidy in a prior proceeding and included in the CVD rate here, was export contingent and therefore not

*Confidential Information Omitted*

eligible to be considered a countervailable upstream subsidy. Id. Commerce and Kenertec ask the court to sustain the final remand redetermination. Gov't Supp. Br. at 5–8; Kenertec Supp Br. at 9–10. WTTC claimed that Commerce's decision to exclude the Redistrict Loan Program in its upstream subsidy calculation was improper because there is no evidence on this record demonstrating that the Redistrict Loan Program was an export subsidy. WTTC Supp. Br. at 3.

WTTC also posits that if Commerce does not retain the Rediscount Loan Program in the upstream subsidy calculation or rely on record information as facts available to reach a positive CVD rate, it must reopen the record and complete a full upstream subsidy investigation. WTTC Supp. Br. at 11–12. WTTC has cited nothing that constitutes such a legal compulsion. Further, if Commerce believed its investigation to be inadequate it could have requested a remand to perform an adequate investigation. It did not do so; only WTTC seeks this relief.[2]

An "upstream subsidy" is any countervailable subsidy, other than an export subsidy, that: (1) is paid or bestowed by an authority with respect to an input product that is used in the same country as the authority in the manufacture or production of subject merchandise; (2) in Commerce's judgment bestows a competitive benefit on the merchandise; and (3) has a significant effect on the manufacturing or production costs of the subject merchandise. 19

---

[2] WTTC also claims that Commerce did not investigate matters it alleged apart from the prior CTL Plate subsidy investigations. Commerce apparently found inadequate reasons to further investigate the additional matters raised by WTTC. See Final Remand Redetermination at 18–19. As indicated, preliminarily Commerce decided to defer the entire upstream subsidy investigation. At that point, WTTC clearly had the opportunity to withdraw its upstream subsidy allegation and refile its petition if it believed it could better support its allegation or that Commerce simply did not have the time to adequately investigate, as WTTC's allegation was filed late in the investigation, even if timely. See 19 C.F.R. § 351.311(c). Whether or not WTTC could have withdrawn its petition when it became aware that Commerce decided it could conduct its investigation with prior subsidy results, WTTC apparently did not seek to do so then, or at any other time. Having foregone the remedy available under § 351.311(c) and having accepted the results of the normal but narrow investigative practice of Commerce, it is too late for WTTC to ask the court to compel Commerce to redo its investigation simply because WTTC disagrees with the final determination after remand.

U.S.C. § 1677-1(a) (emphasis added). Therefore, Commerce's classification of the Rediscount Loan Program as an export-contingent subsidy, if supported, would be fatal to its inclusion in the upstream subsidy calculation.

Here, Commerce asserts that information included in the current record regarding the extent of a countervailable upstream subsidy provided to Krakatau POSCO was either not available or not able to be verified, and thus it was reasonable to rely on the results of prior investigations. Final Remand Redetermination at 6; IDM at 59. Commerce has promulgated a practice to rely primarily on previous subsidy findings when conducting an upstream subsidy analysis. See Countervailing Duties, 63 Fed. Reg. 65,348, 65,392 (Dep't Commerce Nov. 25, 1998). As with its initial decision to attribute subsidy rates from previous proceedings to Krakatau POSCO, Commerce also found that the Rediscount Loan Program was contingent upon export performance based on previous subsidy findings in CTL Plate from Indonesia and Extruded Rubber Thread from Indonesia. See Final Affirmative Countervailing Duty Determination: Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia, 64 Fed. Reg. 73,155 (Dep't Commerce Dec. 29, 1999) ("CTL Plate from Indonesia"); Final Negative Countervailing Duty Determination: Extruded Rubber Tread from Indonesia, 64 Fed. Reg. 14695 (Dep't Commerce Mar. 26, 1999) ("Extruded Rubber Thread from Indonesia"); Final Remand Redetermination at 8–10.

WTTC challenges Commerce's methodology here. WTTC posits that Commerce erred in removing the Redistrict Loan Program from the upstream subsidy calculation because it is based on evidence not in the record. WTTC Supp. Br. at 3–6. Commerce counters that it has authority to make a determination on the basis of facts available from other proceedings. See 19

Court No. 20-03687 Page 17
**Public Version**

U.S.C. § 1677e(a)(1), (a)(2)(D); <u>Final Remand Redetermination</u> at 13. Whether or not Commerce relied upon "facts otherwise available" as set forth in § 1677e(a), or simply included facts in the record from previous subsidy findings to determine that the Redistrict Loan Program is an export subsidy program, substantial evidence supports Commerce's decision. Commerce may make a determination based on these facts, because no other facts on the record contradict them. See § 1677e(a); <u>Countervailing Duties</u>, 63 Fed. Reg. at 65,392. Thus, Commerce may reasonably consider <u>CTL Plate from Indonesia</u> and <u>Extruded Rubber Thread from Indonesia</u> that concluded that the Redistrict Loan Program was contingent upon export performance. See <u>Extruded Rubber Thread from Indonesia</u>, 63 Fed. Reg. at 48,192; <u>CTL Plate from Indonesia</u>, 64 Fed. Reg. at 73,162.

 For its part WTTC provided no evidence contrary to the facts Commerce relied on. It makes strained arguments essentially that Commerce can cherry-pick the facts as long as it reaches a positive CVD rate. Commerce reasonably relied on a neutral assessment of the facts on hand to determine that the Redistrict Loan Program was export contingent, and properly excluded the program from the upstream subsidy rate calculation pursuant to 19 U.S.C. § 1677-1(a). Commerce's determination was supported by substantial evidence and in accordance with law.[3]

## CONCLUSION

 The affirmative CVD determination preliminarily reached was undermined as facts became available and the law was applied properly. This may be disappointing to WTTC but

---

[3] Kenertec's outstanding claims that Commerce unlawfully initiated an upstream subsidy investigation, and that Commerce's upstream subsidy analysis was unsupported by substantial record evidence, are moot.

Court No. 20-03687 Page 18
**Public Version**

Commerce's final negative CVD determination as amended is accordance with the law and is therefore sustained.  First, the court sustains the final determination finding that Krakatau POSCO is neither an authority, nor did the Government of Indonesia entrust or direct it to provide CTL Plate to Kenertec for LTAR.  Second, the court sustains the final remand redetermination finding that there was no applicable upstream subsidy.

/s/      Jane A. Restani
Jane A. Restani, Judge

Dated: December 28, 2021
         New York, New York